ROBERT K. BLACK, *ET AL.*, PLAINTIFFS-APPELLANTS, v. TOWN OF MONTCLAIR, A MUNICIPAL CORPORATION, *ET AL.*, DEFENDANTS-RESPONDENTS, AND LACOR-DAIRE SCHOOL, A NEW JERSEY CORPORATION, IN-TERVENING DEFENDANT-RESPONDENT.

Argued November 9, 1960—Decided January 23, 1961.

*Mr. George K. Meier, Jr.,* argued the cause for the appellants.

*Mr. Thomas A. O'Callaghan* argued the cause for the respondents (*Messrs. Howe & Davis,* attorneys for intervening defendant-respondent Lacordaire School, etc.; *Mr. Samuel Allcorn, Jr.,* attorney for defendants-respondents Town of Montclair, etc., *et al.*).

The opinion of the court was delivered by

JACOBS, J.  The plaintiffs appealed from a judgment of the Law Division which affirmed the action of Montclair's Board of Commissioners in approving the recommendation of its board of adjustment that a variance be granted to the Lacordaire School.  The variance enabled the construction of a new school building on Lacordaire's premises at Lorraine Avenue and Park Street in Upper Montclair.  We certified the appeal while it was pending in the Appellate Division.

Lacordaire is a private day school for girls in primary and high school and for boys through third grade.  It is operated for children of all faiths by Sisters of the Congregation of the Order of St. Dominic and the curriculum includes, in addition to the courses required for primary and secondary schools by the State Board of Education, instruction in various fields such as music, painting and sculpture as well as religious instruction for its Catholic students. It began operations in 1920 with seven students in a large dwelling house built in 1896 and located at the Lorraine Avenue and Park Street premises.  These premises include

about 3½ acres of land. Through the years its attendance increased steadily and reached 235 in 1958; a coach house on the premises was used for school purposes along with the main building (the dwelling house); and a wing containing four classrooms was added in 1946 to the coach house. The 235 students included 139 high school students who received their instruction on the first and second floors of the main building and 96 elementary school students who received their instruction in the coach house. The 12 Sisters who constitute the faculty live on the third floor of the main building.

In 1937 the area in which Lacordaire is located was placed by Montclair's zoning ordinance in an R–1 residential zone. The permitted uses within that zone include, *inter alia,* schools, libraries and museums operated by the Town of Montclair, churches, privately conducted schools for less than thirteen pupils, and accessory uses customarily incidental to the permitted uses. In 1936 Lacordaire had a student enrollment of 54 and after the adoption of Montclair's zoning ordinance in 1937 it continued its operations as a nonconforming use within the protection of *R. S.* 40:55–48. Several other schools are located within a block or two of Lacordaire; these include Mt. Hebron, a public school through junior high school, St. Cassian's, a parochial school, and a small nursery school on Park Street. No objection has been voiced as to the manner in which Lacordaire has been conducted; on the contrary, the appellants have expressly acknowledged that it is "a fine school, operated by devoted people." In 1955 the Middle States Association evaluated Lacordaire and gave its approval, conditioned however upon the school's providing adequate physical facilities to meet its growth. The school's student population was then 161 and in the light of its later growth there is little room to question that its physical facilities are now grossly insufficient.

In the summer of 1958 Lacordaire proposed the construction of a new one story school building on its premises and

sought a variance. Hearings were held during July and August before the board of adjustment and on September 15, 1958 the board unanimously recommended to the board of commissioners that a variance be granted. On January 13, 1959 the board of commissioners denied the variance without prejudice to a further application. In the meantime the Montclair Fire Department had inspected Lacordaire's premises and had made various recommendations including suggestions that the use of any floor above the first floor in the main building as classrooms "or for other student activities be discontinued" and that "the Sisters presently housed on the third floor be removed to the second floor." After redrafting its plans with a view towards satisfying the board of commissioners, Lacordaire sought a variance to enable the construction of a new two story building on its premises. Hearings were held before the board of adjustment during which considerable testimony was introduced in support of and in opposition to the request for a variance. Two expert witnesses testified for Lacordaire that property values in the area would in nowise be impaired by the proposed construction whereas one expert witness for the appellants testified to the contrary. Similarly, witnesses who lived in the immediate neighborhood expressed divergent views not only as to the effect of the proposed building on property values but also as to its effect on street parking, traffic and related conditions.

On May 19, 1959 the board of adjustment filed a formal decision in which it recommended to the board of commissioners that a variance be granted subject to conditions which it outlined. It expressly found that Lacordaire's present facilities are obsolete and outmoded and that there was danger of overcrowding; that the automobile traffic congestion in the area was not "directly and solely related" to Lacordaire; that "the continuous use of these premises for educational purposes for 37 years past should not be endangered or ended by the refusal to permit proper modernization and limited expansion of the existing facilities"; that "the educational and

cultural use of the premises is in furtherance of the general welfare of the community" and that the modest increase of pupils which would be permitted by granting the variance would "not constitute a substantial enlargement of the present use" and that the variance could be granted, subject to the conditions outlined, "without substantially impairing the intent and purpose of the Zone Plan of the Zoning Ordinance of the Town of Montclair." The conditions which the board recommended included the following: (1) that the present main building be used solely for the residence of the Sisters, a chapel, a library and administrative offices and not for classrooms or student quarters, (2) that total registration of students shall not at any time now or in the future exceed "200 in the high school and 90 in the elementary school for a total of 290 in the entire school," (3) that trees and shrubbery not within the perimeter of the proposed new building and driveways be preserved and that "no other area or areas of the entire plot shall be hard surfaced for playground, parking or other incidental or accessory uses," (4) that no portion of the plot north of the coach house and the proposed new building and no portion of the plot south of the main building and the proposed new building be used now or hereafter for extensions or additional buildings for school purposes or accessory uses, (5) that all vehicular parking accessory and incidental to the school during school hours be limited to the existing driveways and parking area, (6) that the auditorium-gymnasium be not used for public or private functions except Lacordaire functions directly connected with and limited solely to its educational and cultural program, and (7) that Lacordaire by acceptance of the conditions shall be deemed to have agreed to abide by them so long as its premises are in a residential zone under a zoning ordinance having substantially the same limitations as are now in effect.

On June 16, 1959 the board of commissioners adopted a resolution approving the recommendations of the board of adjustment and granting permission to build the proposed

new building in accordance with the filed plans and subject to the conditions which were outlined by the board of adjustment. Thereafter the plaintiffs filed a complaint in lieu of prerogative writ in which they demanded that the determination of the board of commissioners and the board of adjustment be set aside as "unreasonable, arbitrary and capricious" and that Montclair's Inspector of Buildings be restrained from issuing a building permit to Lacordaire. Answer was filed on behalf of the board of commissioners and the board of adjustment; Lacordaire was permitted to intervene as a defendant and it duly filed its answer; the matter was pretried, argument was had before Assignment Judge Waugh and on December 20, 1959 he rendered his decision against the plaintiffs. In the course of his opinion he relied upon the principles expressed in this court's recent decisions in *Grundlehner v. Dangler*, 29 *N. J.* 256 (1959) and *Andrews v. Ocean Twp. Board of Adjustment*, 30 *N. J.* 245 (1959) and expressly found that there had been no showing which would warrant judicial interference with the municipality's exercise of its discretionary authority under *N. J. S. A.* 40:55–39(*d*). See *Ward v. Scott*, 16 *N. J.* 16 (1954). Formal judgment dismissing the complaint was entered on January 26, 1960 and the plaintiffs duly appealed therefrom on March 8, 1960; in support of their appeal they now urge that "the variance recommended and approved is unlawful" and that "there are insufficient findings made by the Board that would warrant granting of the relief sought by Lacordaire."

In *Monmouth Lumber Co. v. Ocean Township*, 9 *N. J.* 64 (1952) the court reviewed the history of *N. J. S. A.* 40:55–39 and pointed out that whereas subsection (c) authorized the board of adjustment to grant a variance upon a designated showing of practical difficulties or undue hardship, subsection (d) deliberately omitted all reference to practical difficulties or undue hardship and authorized the board to recommend a variance where it appeared that there were "special reasons" and that a grant of the variance would be without "sub-

stantial detriment to the public good" and would "not substantially impair the intent and purpose of the zone plan and zoning ordinance." Under the terms of subsection (d) the municipal governing body was expressly authorized to approve or disapprove the board's recommendation by resolution. In *Ward v. Scott,* 11 *N. J.* 117 (1952) the court rejected a contention that the recommendatory procedure set forth in subsection (d) was unconstitutional as failing to embody a sufficient standard to guide the actions of the board of adjustment and the governing body; it pointed out that the affirmative standard of special reasons must be read in the light of the proper zoning purposes set forth in *R. S.* 40:55–32 (which includes, *inter alia,* "the promotion of health, morals and general welfare") and that the negative standards precluded any action which was substantially detrimental to the public good or substantially impaired the zone plan and zoning ordinance; and in *Ward v. Scott,* 16 *N. J.* 16 (1954), it sustained a variance which had been recommended by the board of adjustment and approved by the governing body to enable the construction of a retail shopping center which they concluded would be for the public good and would benefit "both the particular neighborhood and the town generally." 16 *N. J.,* at *p.* 22.

In *Ranney v. Istituto Pontificio Delle Maestre Filippini,* 20 *N. J.* 189 (1955), the court, with three of its members dissenting, set aside a variance which had been granted to enable the enlargement of Villa Walsh, a Catholic school in Morris Township; and in *Moriarty v. Pozner,* 21 *N. J.* 199 (1956), the court, with three of its members dissenting, set aside a variance which had been granted to enable the construction of a retail shopping center in the Township of North Bergen. Although these decisions are heavily relied upon by the appellants their authority here has been nullified by more recent opinions of this court. See *Grundlehner v. Dangler, supra,* 29 *N. J.* 256; *Andrews v. Ocean Twp. Board of Adjustment, supra,* 30 *N. J.* 245; *cf. Schoelpple v. Woodbridge Twp.,* 60 *N. J. Super.* 146, 149 (*App. Div.*

1960). In *Grundlehner* the owner of a funeral home which had been operated as a nonconforming use applied to the board of adjustment for a variance to enable the construction of an extension; the court held that the application could be entertained by the board under subsection (d) although it remitted the matter for further factual findings; it pointed out that an enlargement of a nonconforming use could properly be permitted upon recommendation of the board and approval by the governing body provided there was a special reason and no substantial detriment to the public good or substantial impairment of the zone plan; and it restated the principles in *Ward v. Scoll, supra,* 16 *N. J.* 16, including the following excerpt which it expressly reaffirmed and which bears repetition here:

"Earlier judicial views have been displaced by recent cases in this court which hold that municipal governing bodies may exercise broad powers in their zoning regulation of land and structures. See *Fischer v. Township of Bedminster*, 11 *N. J.* 194, 201 (1952); *Lionshead Lakes, Inc. v. Township of Wayne*, 10 *N. J.* 165 (1952), appeal dismissed, 344 *U. S.* 919, 73 *S. Ct.* 386, 97 *L. Ed.* 708 (1953); *Duffcon Concrete Products v. Borough of Cresskill*, 1 *N. J.* 509 (1949). Although these cases have been the subject of varying comments, we are convinced that they are in furtherance of constitutional and statutory objectives and the public welfare generally. Compare *Haar, Zoning for Minimum Standards: The Wayne Township Case*, 66 *Harv. L. Rev.* 1051 (1953), with *Nolan and Horack, How Small a House?—Zoning for Minimum Space Requirements*, 67 *Harv. L. Rev.* 967 (1954). See 4 *Rutgers L. Rev.* 71 (1950); 6 *Rutgers L. Rev.* 93 (1951); 7 *Rutgers L. Rev.* 85 (1952); 8 *Rutgers L. Rev.* 73 (1953). But we are equally convinced that the sanctioning of far-reaching zoning restrictions must fairly be accompanied by sympathetic recognition that there will arise, from time to time, exceptional situations which will justly call for individual variances within the prescribed legislative conditions and standards. See *N. J. S. A.* 40:55-39; *Ward v. Scott*, 11 *N. J.* 117, 122 (1952). Local officials who are thoroughly familiar with their community's characteristics and interests and are the proper representatives of its people, are undoubtedly the best equipped to pass initially on such applications for variance. And their determinations should not be approached with a general feeling of suspicion, for as Justice Holmes has properly admonished: 'Universal distrust creates universal incompetence.' *Graham v. United States*, 231 *U. S.* 474, 480, 34 *S. Ct.* 148, 151, 58 *L. Ed.* 319, 324

(1913). Where  *  *  *  the application for variance has been
given careful and conscientious consideration by the zoning board
and the town council and has been acted upon by both of them in
strict conformity with the procedural and substantive terms of the
statute, the ultimate interests of effective zoning will be advanced
by permitting the action of the municipal officials to stand, in the
absence of an affirmative showing that it was manifestly in abuse
of their discretionary authority. *Cf. Cobble Close Farm v. Bd. of
Adjustment of Middletown Tp.*, 10 *N. J.* 442, 453 (1952) ; *Schmidt
v. Board of Adjustment of City of Newark, supra* [9 *N. J.* 405]."
29 *N. J.*, at *pp.* 268–269

In *Andrews v. Ocean Twp. Board of Adjustment, supra,*
there was an application to enable the construction of a
parochial school in a residential zone. The board of ad-
justment recommended a variance under subsection (d) and
the governing body approved. Their action was sustained
by the Law Division and, on appeal, by this court in an
opinion which pointed out that no definition of the special
reasons referred to in subsection (d) had been attempted
beyond a reference to *R. S.* 40:55–32, that a precise formula
was not feasible because of the nature of the subject, and
that "each case must turn upon its own circumstances."
30 *N. J.*, at *p.* 251. With specific regard to *R. S.* 40:55–32
(which includes promotion of the general welfare as one
of the objectives of zoning), the court noted that the general
welfare is directly furthered by the education of children
and that there was an affirmative need since Catholic chil-
dren of the township were then attending an Asbury Park
parochial school with limited facilities. The court of course
recognized that the board of adjustment and the governing
body were not obliged to grant the application simply be-
cause the applicant was an educational institution; on the
contrary, the officials were obliged to evaluate the applica-
tion carefully in the light of the settled zoning principle
that variances constitute exceptional relief and are to be
granted only sparingly and with great caution. But since
the officials had presumably evaluated it in that light and
had conscientiously exercised their discretion in favor of
the granting of the application, the issue before the court

became a different one for it is acknowledged that, on judicial review, the court will not consider whether it would have originally granted the application if it were the local body but will permit the local action to stand in the absence of an affirmative showing that it was arbitrary, capricious or in abuse of the discretionary municipal authority. The court determined that under the particular circumstances presented by the record before it, the action of the local officials could not be denounced as arbitrary or capricious and that there was consequently "no basis for judicial intervention." See 30 *N. J.*, at *p.* 251.

Similarly, in the instant matter, we find no showing that the action of the local officials of Montclair in granting the zoning variance to Lacordaire was actually arbitrary or capricious. It must be borne in mind that although the general area in question was residential it was already populated by several schools, including Lacordaire, and that the relief granted was not to enable the establishment of a wholly new and additional school but to enable the modernization and enlargement of one of the existing schools. See *Grundlehner v. Dangler, supra,* 29 *N. J.*, at *p.* 267. There was evidence from which the local officials could properly conclude that the proposed construction would not adversely affect property values or the residential character of the neighborhood; indeed, there was testimony that the property values would be enhanced and several witnesses indicated that they recently moved into the neighborhood not only with knowledge of the existence of Lacordaire and the other schools but partly because the schools were nearby and could be readily attended by their children. There was evidence of heavier traffic in the area during the hours when students came to and left Lacordaire and the other schools but there was nothing to indicate any unmanageable congestion and the local officials could properly conclude that the increase from 235 students to the outside limit which they prescribed at 290 would play no significant part on the traffic, street parking and related conditions. Insofar

as any evening functions are concerned, the evidence indicated that there were very few such functions conducted annually by Lacordaire and one of the express conditions imposed by the local officials confined the use of Lacordaire's auditorium-gymnasium strictly to Lacordaire's educational and cultural program and excluded its use by organizations other than Lacordaire.

We consider that the findings by the local officials were legally adequate to satisfy the requirements of *N. J. S. A.* 40:55–39(*d*). They set forth that Lacordaire's main building, erected in 1896, is outmoded and its facilities obsolete and that there is danger in overcrowding it with the high school girls; that Lacordaire's continuous use of its premises "for 37 years past" should not be endangered or ended by refusing it permission to modernize and expand within the limitations prescribed; and that the educational and cultural use of Lacordaire's premises is in furtherance of the welfare of the community. The foregoing met the affirmative special reason requirement of subsection (d) of *N. J. S. A.* 40:55–39. See *Andrews v. Ocean Twp. Board of Adjustment, supra,* 30 *N. J.,* at *p.* 251. The negative criteria of *N. J. S. A.* 40:55–39 were met by a finding that the variance could be granted upon the specified conditions "without substantially impairing the intent and purpose of the Zone Plan of the Zoning Ordinance of the Town of Montclair"; and although the finding did not embody any explicit statement that the relief could be granted "without substantial detriment to the public good," (see *N. J. S. A.* 40:55–39) that inadvertent omission may fairly be supplied here by implication from the acknowledged circumstances and the action taken including the detailed protective conditions to the grant of the variance. *Cf. Andrews v. Ocean Twp. Board of Adjustment, supra,* 30 *N. J.,* at *p.* 249; *Lubliner v. Board of Alcoholic Beverage Control for City of Paterson,* 33 *N. J.* 428, 446 (1960).

The plaintiffs suggest that the hardship to Lacordaire resulting from its increased student attendance was self-

created, that there was no proof that a need for the school existed in the area, that there was no evidence indicating that Lacordaire's land was not suitable for residential development, and that the 3½ acre plot owned by Lacordaire was smaller in size than recommended for public schools by the State Board of Education. We may assume, for present purposes, that Lacordaire might have kept its enrollment very small by persistently withstanding the increased demands and expectations resulting from the widespread population and other social changes. That it did not do so was to its credit for the intensified need for additional educational facilities in the general area may readily be gathered from the totality of the evidence in the record before us. The special reason which motivated the granting of Lacordaire's application was not grounded on hardship to Lacordaire but was grounded on the general welfare of the community which, the local officials found, would be promoted by permitting the modernization and enlargement of the school within the limitations prescribed. The fact that the land owned by Lacordaire might be suitable for residential purposes if the school were not there seems to have little materiality; and the fact that the plot owned by Lacordaire is lesser in size than recommended for public schools would appear to have no controlling significance since there is no suggestion that it is not wholly adequate to enable the functioning of Lacordaire in suitable manner. See *In re O'Hara's Appeal*, 389 *Pa.* 35, 131 *A. 2d* 587, 597 (*Sup. Ct.* 1957).

The plaintiffs contend that the variance granted to Lacordaire is unlawful because there was no proof introduced before the board of adjustment that Lacordaire's present use is a valid nonconforming use within *R. S.* 40:55–48. In particular, the plaintiffs assert that the record does not establish when the second and third floors of the main house were first used for classrooms and Sisters' quarters (*cf. Mocco v. Job*, 56 *N. J. Super.* 468 (*App. Div.* 1959)) and that it does not establish whether a variance was ever ob-

tained to enable the construction of the new wing which was added in 1946 to the coach house. The plaintiffs' contention was not raised, as it should have been, before the board of adjustment and the Law Division. See *Morin v. Becker,* 6 *N. J.* 457, 460 (1951); *Abel v. Elizabeth Bd. of Works,* 63 *N. J. Super.* 500, 510 (*App. Div.* 1960). Furthermore, we believe that it may fairly be inferred from the record that prior to the passage of Montclair's 1937 ordinance the main building in its entirety was considered as dedicated to school purposes and was used both for student classrooms and teachers' living quarters. At that time there were 54 students and although the zoning ordinance provided only for privately conducted schools for less than 13 pupils, the school validly continued operations thereafter as a nonconforming use. The gradual increase in the number of attending students which necessitated internal changes in the classrooms and living quarters would not, under most of the precedents, be considered an unlawful extension of the nonconforming use. See *Lamb v. A. D. McKee, Inc.,* 10 *N. J. Misc.* 649 (*Sup. Ct.* 1932); *Building Commissioner of Medford v. McGrath,* 312 *Mass.* 461, 45 *N. E. 2d* 265 (*Sup. Jud. Ct.* 1942); *In re 501 Paxinosa Ave., Easton,* 367 *Pa.* 340, 80 *A. 2d* 789 (*Sup. Ct.* 1951); *People v. Ferris,* 18 *Ill. App. 2d* 346, 152 *N. E. 2d* 183 (*App. Ct.* 1958); *cf. Nyburg v. Solmson,* 205 *Md.* 150, 106 *A. 2d* 483, 46 *A. L. R. 2d* 1051 (*Ct. App.* 1954); *Kramer v. Town of Montclair,* 33 *N. J. Super.* 16 (*App. Div.* 1954); but *cf. Pisicchio v. Board of Appeals,* 165 *Misc.* 156, 300 *N. Y. S.* 368 (*Sup. Ct.* 1937); *Edmonds v. Los Angeles County,* 40 *Cal. 2d* 642, 255 *P. 2d* 772 (*Sup. Ct.* 1953). See also *Martin v. Cestone,* 33 *N. J. Super.* 267, 270 (*App. Div.* 1954); *Gross v. Allan,* 37 *N. J. Super.* 262, 272 (*App. Div.* 1955).

However, we need not pursue the inquiry as to whether Lacordaire's use of its second and third floors for classrooms and Sisters' quarters was originally improper for, even assuming that it was, the local authorities nonetheless had ample

power to grant the variance for the new school building. Their grant was not dependent upon a lawful nonconforming use since subsection (d) is broad enough to, permit a use which enlarges or validates a prior nonconforming use or a wholly new use unrelated to any prior nonconforming use. See *Ward v. Scott, supra*, 16 *N. J.* 16; *Grundlehner v. Dangler, supra*, 29 *N. J.* 256; *Andrews v. Ocean Twp. Board of Adjustment, supra*, 30 *N. J.* 245. In granting the variance the local officials were not misled on this score since they were aware of the fact that, through the years, Lacordaire had, without seeking variances, made such internal changes as were necessitated by the gradual increase in the number of its students. Insofar as the new wing to the coach house was concerned it is acknowledged by all that a variance was required for its construction but here again we are satisfied from the record that the local officials did not act under any misapprehension and that their granting of the variance for the new school building was in nowise dependent upon the propriety of the 1946 addition to the coach house. During the hearings, witnesses were asked whether application had been made to the board of adjustment at the time of the addition but they replied that they did not know. The subject was never pursued by counsel for the appellants and the variance was duly recommended and approved without regard to it. We assume that if official investigation hereafter discloses that the wing was improperly constructed then suitable steps will be taken towards correction or validation; but that matter furnishes no reason for upsetting the grant of the variance authorizing the construction of the new school building. Accordingly the judgment appealed from is in all respects:

Affirmed.

HALL, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.