79 N.J. Super. 509 (1963)
192 A.2d 177
ETHEL YAHNEL, JACK AND IRMA SAUERMAN AND RUDOLPH AND MARY ANN WOLFINGER, PLAINTIFFS-APPELLANTS,
v.
BOARD OF ADJUSTMENT OF JAMESBURG, N.J., MAYOR AND BOROUGH COUNCIL OF JAMESBURG, N.J., FRANK PERGOLA, BUILDING INSPECTOR OF JAMESBURG, NEW JERSEY BELL TELEPHONE COMPANY, A CORPORATION OF NEW JERSEY, AND MICHAEL AND ROSE SEMINARA, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 29, 1963.
Decided June 20, 1963.
*510 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Frederick F. Richardson argued the cause for appellants.
Mr. William C. Davis argued the cause for respondents New Jersey Bell Telephone Company and Michael and Rose Seminara (Messrs. Starr, Summerill & Davis, attorneys).
Mr. Guido J. Brigiani argued the cause for respondents Board of Adjustment of Jamesburg, Mayor and Borough Council of Jamesburg, and Frank Pergola, Building Inspector of Jamesburg.
*511 The opinion of the court was delivered by CONFORD, S.J.A.D.
The Jamesburg board of adjustment recommended and the borough council approved a variance from the zoning ordinance to permit the construction in an "A" residence zone of a one-story brick and masonry building by the New Jersey Bell Telephone Company for the maintenance of equipment to provide dial telephone service in the Jamesburg area. Neighboring residence owners on the street involved, Forsgate Drive, brought an action to set aside the variance, and appeal from a dismissal of their complaint by Judge Molineux, sitting temporarily in the Law Division.
There were two hearings before the board of adjustment in this matter. The initial hearing, in August 1961, on an application for a variance "for special reasons" pursuant to N.J.S.A. 40:55-39(d), resulted in a recommendation for a variance and an approval thereof, by board and council respectively, followed by a challenge of that action by suit in the Law Division. That court found an absence of adequate record and findings by the board of adjustment and remanded the matter to the board to supply the deficiencies. Thereupon a new hearing was held March 29, 1962, and comprehensive findings were arrived at and embodied in a resolution of recommendation. After approval thereof (with conditions) by the borough council, the Law Division filed an opinion and entered the judgment of dismissal from which the appeal herein has been prosecuted. Yahnel v. Bd. of Adjust. of Jamesburg, 76 N.J. Super. 546 (Law Div. 1962).
Solely for the purpose of better understanding the evidence of record and matters stipulated, on which alone our considerations must be based, we have inspected the property in question and the surrounding neighborhood.
The lot in question is a rectangular vacant tract 258 feet in depth by 100 feet in width situated on the southerly side of Forsgate Drive. It is owned by Seminara and optioned for sale to the telephone company. It lies between two residences, one to the east owned by plaintiffs Sauerman, the other to the west owned by plaintiff Yahnel, who personally bore the brunt *512 of the opposition to the application before the board, appearing there pro se. All three of the lots mentioned have the same depth. The Sauermans', however, has a frontage of 201 feet; Yahnel's, 100 feet. West of the Yahnel home on the southerly side of Forsgate Drive lie six other residences on lots with frontages of from 35 feet to 95 feet, all but one with depths of 145 feet. West of these homes the southerly line of Forsgate Drive is intersected by the easterly line of Perrineville Road. All eight homes mentioned are rather old and most of them of modest size. The Yahnel and Sauerman rear yards are attractive areas, with trees and plantings. The row of homes mentioned (along with the locus in quo) occupies the whole block on the southerly side of Forsgate Drive between Perrineville Road on the west and Lake View Road on the east, the latter being a short thoroughfare serving as an entrance to a county park which lies to the rear of these homes on Forsgate Drive and provides an attractive vista from the rear yards of these properties. Forsgate Drive has its easterly terminus about 100 feet or so east of Lake View Road, there running into Railroad Avenue, a principal commercial thoroughfare of the borough, zoned for business. Looking easterly from in front of the property in question toward Railroad Avenue the view is dominated by a large 3-story industrial building on the easterly side of Railroad Avenue.
While the southerly side of Forsgate Drive is zoned "A" Residence, restricted to use for one-family homes on frontages of at least 75 feet (five of the eight present homes are nonconforming), home occupations, public schools and churches, the northerly side of the street for the most part is zoned "B" Residence, permitting, in addition to "A" Residence uses, four-family residences, hospitals, schools generally, and playgrounds. The property at the northwest corner of Forsgate Drive and Railroad Avenue is zoned Business, being part of a "strip" business zone on Railroad Avenue. That property is referred to in the proofs as the DiGangi property, now used for an ice-cream stand and attendant parking space. At the time of the hearing herein, however, that parcel was the site *513 of a rambling, one-story multi-family dwelling scheduled to be and in fact demolished shortly thereafter. (Exhibit A-10 shows the former building, not the ice-cream stand.) Proceeding westerly along the northerly side of Forsgate Drive from the DiGangi property are found, directly across the street from the locus in quo and the Yahnel home, a vacant, uneven triangular tract of land, and then the rear of a cleaning plant and of a dress factory, both properties running through from Willow Street to Forsgate Drive, those streets forming an acute angle intersection at that point. Closely visible from the locus in quo behind the vacant tract mentioned are the rear yards of small residences fronting on Willow Street. Gatzmer Avenue, coming from the north, also meets the intersection of Willow Street and Forsgate Drive. Visible from several of the homes afore-mentioned on the southerly side of Forsgate Drive are a service station and launderette at the northwest corner of Gatzmer Avenue and Forsgate Drive, as well as a combination confectionery-food market on the opposite corner of Gatzmer Avenue and Willow Street. All of the afore-mentioned commercial operations (except that on the DiGangi property) are nonconforming uses in a "B" Residence zone, antedating the 1950 zoning ordinance. However, along with the back yards of the Willow Street homes, they dominate and spoil the view (from a residential standpoint) from the front of the row of homes on the southerly side of Forsgate Drive mentioned. Obviously alluding to such nearby uses, plaintiff Sauerman referred to them as "blights" and said he expected them to be "alleviated," but he did not explain when or how.
The building which the telephone company seeks to erect on the property in question will, according to the rendering submitted to the board of adjustment, be an attractive, off-white brick exterior, one-story structure, with decorative face-panelling on the front wall at the entrance. It is to be set back 50 feet, with a lawn maintained in the front. The general effect is of a neat, modern laboratory-type or office building. There are to be no offices here, however. A 12-foot driveway will *514 lead to a paved parking area in the rear, 60 feet in depth. The remaining 100 feet of rear yard will be left unpaved. There will be four employees regularly stationed in this building, but in emergencies others may be there temporarily. The general public will have no occasion to visit this building.
The decision to construct this facility was taken by the telephone company on the basis of a survey of present and reasonably prospective telephone requirements of the Jamesburg area. This is to be a dial central office to replace, we gather (the testimony is not too clear), an existing manual office housed in a building several blocks away. The company's technical representative at the hearing, Mr. Lewis, testified that the "optimum" location for such a dial office should be at the "wire center" of the area. This means that location which results in the greatest equalization of transmission load, so as to afford all subscribers in the area served reasonably adequate transmission. Lewis testified that engineering studies indicate that the wire center had a radius of 200 to 300 feet, but he conceded, on cross-examination, that it would extend 400 feet. The locus in quo was described as having been found to be the only available vacant land within the wire center suitable for purposes of construction of the dial office, and the most desirable location within that area for the purpose. Suitability, according to Lewis, involved, in addition to location, factors of size, shape, topography and cost.
The telephone company did not undertake to catalogue all the properties it had considered for this function or to detail why it had found them all unsuitable except the subject property, but as to several concerning which Lewis was specifically interrogated on cross-examination, he stated in each instance that the property was unsuitable. As to others mentioned, he professed to have no knowledge. The nearby DiGangi site on Railroad Avenue was said to be inadequate as to size. The Collins property on Gatzmer Avenue, for which the telephone company had previously obtained a variance for this purpose, was described as "not suitably available." The cross-examiner did not press to find out why. (The minutes of the board on *515 the original hearing indicate title could not be cleared to the Collins property.) The existing manual office of the company was also said to be an inadequate site for this purpose. The objectors produced only one witness, Mr. DiGangi, concerning the availability of other property. He said his property was for sale. The objectors had no competent evidence as to the availability or suitability of any alternative property for the particular requirements of the company.
The applicant also offered the testimony of a realty expert, Gerston Rocker. He examined the neighborhood surrounding the property and described it as having "a little bit of everything." In his opinion, the construction of the dial equipment center, as planned, would have no effect on surrounding property values. He said the property values had been "established" by the existing surroundings and would not be increased or decreased by what was erected here. He opined that the locus in quo was not a good residential site because of what was across the street.
The essence of the testimony adduced by the objectors was that a commercial building would necessarily affect the value and residential quality of the homes on the street, particularly those adjacent to the site involved. The paving of the proposed rear parking lot was regarded as especially offensive to the enjoyment by the Yahnel and Sauerman families of their back yards.
The resolution of the board of adjustment recommending the variance contains the following findings:
"(a) The premises which are the subject matter of the application for a variance of vacant land situated on Forsgate Drive, having a width of 100.33 feet and a maximum depth of 263.57 feet.
(b) The building proposed to be erected will be for the housing of telephone equipment to provide dial service to Jamesburg and the surrounding area; and will be constructed of reinforced concrete with a masonry exterior.
(c) No public offices will be housed in said building and no more than 4 persons will be assigned on a regular basis to maintain and service the equipment.
(d) The proposed building is 76' 10" wide and 52' 11" deep, with a height of 16' 5 1/2"; the set back from Forsgate Drive is 50', with *516 a westerly side yard 8' wide and an easterly side yard about 15' 5" wide; a 12' driveway will lead to the rear parking area, which is proposed to be 60' in depth.
(e) On the opposite side of Forsgate Drive are a dry cleaning establishment, a manufacturing establishment, an unimproved tract, as well as a number of residences. Also in the general area are a service station, a laundromat, and an ice cream store.
(f) The present telephone company facilities in Jamesburg consist of a manual office servicing about 2600 telephones.
(g) The optimum location of a dial central office is the wire center of the area to be serviced, based on such factors as density, growth and physical distance, so as to equalize the transmission load.
(h) The wire center of the Jamesburg area, as determined by the above factors, is on Forsgate Drive, encompassing a radius of 200 to 300 feet, within which is the lot for which the variance is sought.
(i) No other suitable vacant land is available within the wire center for the proposed use.
(j) The proposed use will have no deleterious effect on the neighborhood and property values will not be disturbed."
Special reasons "to justify" the variance and statutory determinations pursuant to the requirements of N.J.S.A. 40:55-39 were as follows:
"(a) The proposed use, being for the construction of a dial center to provide telephone service for Jamesburg and the surrounding area, is in furtherance of and will promote the general welfare of the community, and thus is founded upon the zoning objectives set forth in R.S. 40:55-32.
(b) The site in question, being within the wire center, is peculiarly suitable for the proposed use; so that the granting of the variance will encourage the most appropriate use of the land, and will conserve the value of the property.
BE IT FURTHER RESOLVED that the variance can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zone plan and zoning ordinance.
BE IT FURTHER RESOLVED that the Board of Adjustment of the Borough of Jamesburg does hereby recommend to the Mayor and Borough Council of the said Borough of Jamesburg that the variance sought by the applicant be granted."

I.
Plaintiffs argue a number of points which in combination challenge the validity of a grant of variance as a matter of zoning law.
*517 Defendants urge that the action of the Jamesburg authorities is well within the authorization of the cited statute, particularly in the light of the most recent holdings of the Supreme Court as to the meaning and scope of paragraph (d) of N.J.S.A. 40:55-39 in Andrews v. Ocean Twp. Board of Adjustment, 30 N.J. 245 (1959), and Black v. Montclair, 34 N.J. 105 (1961). They also rightly invoke the rule that "where a variance is granted by municipal officials pursuant to statutory authority it is entitled to the customary judicial presumption of validity; and * * * the court may not intervene to set aside such variance except upon a showing that the action of the municipal officials was arbitrary, capricious or in manifest abuse of their discretionary authority." Grundlehner v. Dangler, 29 N.J. 256, 266 (1959).
In Andrews, supra, the court made a far-reaching practical application of the Ward v. Scott doctrine (11 N.J. 117 (1952) and 16 N.J. 16 (1954)) that "special reasons" for recommending a variance from a zoning use restriction are to be governed by the zoning standards set forth in R.S. 40:55-32. It held that a variance may validly be founded upon a special reason supported alone by the criterion of "general welfare," included with others in section 32 of the statute, so long as the grant does not offend the statutory proscription of "substantial detriment to the public good" or substantial impairment of "the intent and purpose of the zone plan and zoning ordinance." (30 N.J., at pp. 249-251.) The variance there upheld was for the establishment of a parochial school in a building theretofore a residence on the ground that the facility was needed by the community and it was for the general welfare that it be provided. In accord: Black v. Montclair, supra. It may be noted that in applying the "general welfare" criterion to support the variance, the Andrews court did not make it a condition that the applicant show that the school could not be established in some other location entailing less injury to nearby property owners, although it did comment, in discussing the "negative" requirements of absence of detriment and injury to the zone scheme, that the *518 establishment of the school might serve as a protective buffer for the benefit of nearby large residences against the depreciating influences of prospective subdivision (30 N.J., at p. 250).
The "general welfare" test for a "special reason" has clear application here. Improved telephonic communications are obviously a subject matter of high relationship to the welfare of the entire community. There was adequate evidence before the board of adjustment, if credited, to justify its findings that the building to be erected would house dial telephone service for the Jamesburg and nearby area; that the proposed location was in a wire center of limited area suitable for such a project, and that no other entirely suitable vacant land was available within the wire center area for the proposed purpose. We need not decide whether the last stated finding was a necessary condition for grant of the variance in the light of our comments on the Andrews case above. If it was, we cannot say that the affirmative finding of the board on the point on the proofs offered was arbitrary or not grounded in the evidence, although a more detailed explanation by the company of the unavailability or unsuitability of other sites in the business area would have been more satisfying.
Plaintiff argues that it was requisite that the applicant show the inutility of the locus in quo for permitted uses before being allowed a (d) use variance. However, while such a showing is the most usual, and remains one recognized type of basis for such a variance, Bern v. Fair Lawn, 65 N.J. Super. 435, 446 (App. Div. 1961), it is perfectly clear from Andrews and Black, particularly the latter decision, as we observed in the Bern case, supra (65 N.J. Super., at p. 447), that the implication in Moriarty v. Pozner, 21 N.J. 199, 210, 211 (1956), that a burden peculiar to the property is the only permissible basis for a (d) variance, is no longer the law in this State, if it ever was. See Black, supra (34 N.J., at p. 111).
It is emphasized in Andrews that a rigid formula cannot be devised for applying the section 32 zoning criteria in a "special reasons" variance situation. "Each case must turn upon *519 its own circumstances." (30 N.J., at p. 251.) Here, a very important community need was being subserved by the variance sought. While it would have been preferable, if possible, to place this facility in a commercial zone, the evidence displayed a genuinely debatable question as to whether other possible locations in such a zone, if available, would have served the public's needs for dial telephone service as suitably as this one. In such circumstances, the decision was for the statutory agencies, not the court.
Plaintiffs challenge the finding of the board that the variance will not substantially impair the intent and purpose of the zone plan and zoning ordinance. The key word here is "substantially." It comes from the statute itself. Obviously, any permission for a nonresidential use in a residential zone may have some tendency to impair residential character, utility or value. But the statutory rationale of the function of the board of adjustment is that its determinations that there are special reasons for a grant of variance and no substantial detriment to the public good or impairment of the zone plan, etc., in such grant represent a discretionary weighing function by the board wherein the zoning benefits from the variance are balanced against the zoning harms. If on adequate proofs the board without arbitrariness concludes that the harms, if any, are not substantial, and impliedly determines that the benefits preponderate, the variance stands. As we said in Rain or Shine Box Lunch Co. v. Newark Bd. of Adjust., 53 N.J. Super. 252, 259 (App. Div. 1958):
"In exercising its administrative function under the cited statutory section the local board of adjustment weighs the evidence before it against the zoning standards and desiderata specified in the statute, makes findings of fact grounded in the evidence and keyed to the standards specified, and arrives at a conclusion as to whether or not, on balance, the evidence and the zoning factors implicated justify the requested recommendation of variance and whether such a variance will offend the omnibus condition in section 39 quoted above. Ward v. Scott, supra (11 N.J. at page 117); Ward v. Scott, 16 N.J. 16 (1954); Moriarty v. Pozner, 21 N.J. 199 (1956); Dolan v. DeCapua, 16 N.J. 599 (1954); Izenberg v. Board of *520 Adjustment of City of Paterson, 35 N.J. Super. 583 (App. Div. 1955)."
Further, id., 53 N.J. Super., at p. 261:
"Against such harm as might be deemed to flow from the variance requested it was incumbent upon the board to weigh the good, in a zoning sense, attributable thereto."
On the facts here presented, taken in entirety, the Jamesburg board's conclusion that there was no substantial impairment of the zone scheme and plan involved in granting the variance and its implicit decision that the zoning benefits from the variance in terms of the general welfare of the community outweighed any zoning harm attributable to placing this building at the particular site in question cannot fairly be assessed as arbitrary or capricious to the point of justifying the judicial veto over the joint judgment of zoning board and governing body. Grundlehner v. Dangler, ubi cit., supra. The character of the neighborhood as a whole was material in such a weighing of zoning harms and benefits. So, too, was the comparative attractiveness, as commercial uses go, of the commercial use involved in this application. There was thus no legal impropriety in the action of the local bodies in granting this variance.

II.
Plaintiffs argue a number of other points consisting of various alleged procedural deficiencies in the proceedings leading to the recommendation and approval of the variance. These are taken up and disposed of by the trial court under points (1) to (6) of its opinion (76 N.J. Super., at pp. 549-554). We agree with Judge Molineux's determinations, all adverse to plaintiffs, as to each of these contentions.
The judgment will be affirmed, but without costs.