276 N.J. Super. 598 (1994)
648 A.2d 724
NYNEX MOBILE COMMUNICATIONS COMPANY, PLAINTIFF-RESPONDENT,
v.
HAZLET TOWNSHIP ZONING BOARD OF ADJUSTMENT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 1994.
Decided June 17, 1994.
*600 Before Judges SHEBELL, LONG and LANDAU.
John T. Lane, Jr. argued the cause for appellant (Dowd & Reilly, attorneys for appellant; Mr. Lane on the brief).
Richard D. Stanzione argued the cause for respondent (Giordano, Halleran & Ciesla, attorneys for respondent; Mr. Stanzione and Timothy F. Mulligan, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
In July 1992, pursuant to N.J.S.A. 40:55D-70(d), plaintiff Nynex Mobile Communications Company applied to the Hazlet Township Zoning Board of Adjustment for a variance which would permit the construction of a mobile communications facility on Block 120, Lots 64 and 64.01, owned by Nero Equipment Company and Shorelands Water Company. The lots, totalling 6.41 acres, are located in a residential zone, known as R-100. Lot 64.01 contains a water tank, treatment plant and treatment lagoons. Lot 64 contains the Shorelands Water Company office building, the Nero Equipment Company garage, gravel packing and storage areas for supplies and construction equipment. The mobile communications facility would consist of a number of panel and whip antennae located on top of the water tower on Lot 64.01 while an equipment shelter would be placed on a leased portion of Lot 64.
Nynex conducted extensive studies to determine the grid layout which would allow optimum cellular telephone coverage to Monmouth County. In determining where in Hazlet it should locate the mobile communications facility, Nynex placed a transmitter on top of the water tower and collected data signals to determine how *601 the antennae, which would be located on top of the water tower, would integrate with the rest of Nynex's system. It was determined by Nynex that the site is the most suitable because it meets the strict technical requirements needed to service the cellular system and the existing water tower eliminates the need to build a monopole on which to place the antennae. Nynex uses at least fifty water towers for cell sites. The site is in the center of the area which is in need of service. Nynex concluded the site would allow it to increase service without any real detriment to the area.
Peter Longo, a licensed professional engineer employed by French & Perillo Associates, testified as to the configuration of the site. The site is bounded by Pine Knot Avenue and Middle Road to the south, a large wooded tract to the east and residences to the north and west. The perimeter of the site is buffered by a row of trees which are roughly forty to sixty feet in height. There is a fence that runs between Lots 64 and 64.01.
The intended location of the mobile communications facility spans a portion of both lots. The antennae would be constructed on top of the existing 130.28 foot water tower which is located on Lot 64.01, while the equipment shelter would be located on a leased portion of Lot 64. Longo testified that the monitoring of the mobile communications facility would be done from a remote location and would normally only require a monthly maintenance visit. According to Longo, Nynex's application would not have any adverse impact on the zoning scheme or plan in the municipality nor would it adversely impact the health and safety of the community.
Hans Leutenegger is the general manager of Network Engineering for Bell Atlantic Mobile Systems and has been an electrical engineer in cellular design with Bell Atlantic Mobile Systems for over five years. He and Longo described the mobile communications facility's antennae. Nine panel antennae, each about four feet high and one foot wide, would be mounted on the railings on the side of the water tower. Nynex had tested the railings at the top of the water tower to assure that they were sturdy enough to *602 support the antennae. Through counsel, Nynex offered to submit its calculations to the Board to demonstrate the adequacy of the railings. It further offered to replace the railings if the Board found them inadequate. In addition to the panel antennae, there would be three omnidirectional whip antennae roughly ten feet in height and between an inch and a half and two-and-three-quarter inches in diameter to be located on the top of the water tower.
The equipment shelter would be located on leased premises, approximately 1000 square feet located on Lot 64. It would be bordered by an eight foot chain link fence with a gate. The equipment shelter is a prefabricated building with concrete walls four to six inches thick and a steel door. The equipment shelter would be an approximately twelve by twenty-six foot facility (292.5 square feet), with electronic equipment, racks of transmitters and coaxial cable running underground from the transmitters to the antennae. Although no personnel would be at the site, the equipment shelter would contain several alarms. The alarms, when activated, would signal to the monitoring station in Jersey City. No alarm would be heard outside the equipment shelter.
Leutenegger testified about the way in which mobile communications facilities must be located and presented a video to support his explanation. He explained that the initial grid included sites in East Brunswick, Freehold, Matawan, Red Bank, Navesink, Long Branch and Tinton Falls. Additionally, at the time of the hearing, a facility was under construction in Holmdel to cover service problems on the Garden State Parkway. Nynex determined that the Hazlet site is important because it provides service coverage to Route 35, Route 36, Middle Road and Union Road. The Hazlet site will provide service where Nynex receives complaints about gaps and unsatisfactory reception. Leutenegger described the use of the cellular telephone during emergencies and indicated that calls to 911 are free. In addition, Nynex also has a number "star CG" which can be used to connect a distressed boater directly to the Coast Guard. Cellular services are used by emergency personnel.
*603 Nynex also presented Lester Nebenzahl, who was the Township planner in Hazlet Township when the master plan was adopted in 1978. Nebenzahl drafted the master plan and the zoning ordinance. In preparing his opinion on Nynex's application, Nebenzahl reviewed the site plan, the Township's development review ordinances, the master plan, the master plan reexamination report and state statutes which relate to the application. In August 1992 he visited the site and conducted interviews with various professionals, representatives of Nynex and the preparers of the engineering documents. Nebenzahl described the application as being consistent with the zoning and the master plan of the Township. He conceded that the R-100 zone, where the mobile communications facility would be located, is residential but emphasized that in 1978 this type of antennae use was not contemplated and therefore would not have been listed as a permitted use in any zone. Nebenzahl stated that Nynex's application satisfies the general goals of the local master plan and the local development regulations: to promote the general welfare, to have efficient use of land, and to promote and have sufficient space and appropriate locations for a variety of uses.
Nebenzahl said that the site is particularly suited for the mobile communications facility because the geographic location would fill the need for communications service for this general area. He testified that cellular communication is increasingly important in business affairs and emergency calls. Additionally, he stated that the site was already being used for a nonresidential purpose and had almost seven times the minimum lot area required in the zone. The site's size and existing physical features, including the water tower, make it uniquely suited for the mobile communications facility.
Nebenzahl further opined that there was no detriment to adjoining properties or the surrounding neighborhood and that the use would not impair the intent of the Township's plan or ordinance. The size and shape of the site enables the shelter to be located away from any sensitive land uses and the existing water tower *604 allows the antennae to be erected without the need to construct a monopole. The mobile communications facility will not generate any significant activity. There will be little to no increase in traffic, and no water, air or noise pollution. Additionally, there will be minimal disturbance to the existing site. The visibility of the antennae is being minimized by its design and color and, given the mass and scale of the existing water tower, the antennae will be virtually unseen. Nebenzahl also gave examples of how mobile telephones can be used in emergencies. In concluding, Nebenzahl recommended that the use variance be granted.
Louis G. Cornacchia, an electronic engineer with thirty years of experience, including employment with the Department of Defense working with microwave systems, also testified for Nynex. He has designed microwave and special purpose computers. Cornacchia testified that the Nynex cellular system is a low-powered system similar to a radio. The power levels involved are low by comparison to AM-FM and T.V. transmitters. The power cellular system Nynex has proposed in its application puts out between .8 and 1 microwatt per centimeter squared. Television signals are broadcast from towers with power levels of up to 5,000,000 watts and commercial radio stations broadcast with power levels up to 100,000 watts. Most cellular antennae are transmitting at 100 watts or less. The transmission frequency used by the mobile communications facility has been extensively studied. Cornacchia testified that it has been determined that the emissions from the transmission frequency do not pose any threat to the public's health. New Jersey has adopted a standard of 2600 microwatts per centimeter squared. According to Cornacchia, the Nynex tower will produce 3000 times less than that standard. Massachusetts has a stricter standard, 500 microwatts per centimeter and Nynex will be 600 times below that. Cornacchia prepared a report which evaluated radio emissions for the Board. His testimony was based on this report. According to the chart, a walkie-talkie emits as much as 10,000 microwatts per centimeter squared; a microwave as much as 5000; a cordless telephone 30 and all of these are government-approved levels. Even if the New Jersey *605 standards change from 2600 to 500, the Nynex installation would still be hundreds of times lower, which is why Cornacchia included the Massachusetts standard.
No witnesses appeared or testified against Nynex. The only concerns raised were advanced by way of questions from Board members or from members of the audience. For example, one Board member inquired into whether the facility would be a high voltage danger if broken into. Leutenegger responded that it would not, because the feed into the facility is normal household current. A citizen asked if a power surge or electrical storm would cause T.V. and appliance interference to which Leutenegger responded "absolutely not." A Board member inquired about the battery backup at the facility:
BOARD MEMBER: The question I had for you was that the hydrogen gas that might come out of there, how far away will the chlorine that's at the water treatment plant be? I know you have the gas and chlorine you have to worry about, could there be a problem with fire or a mixture of the two? Could that cause a problem?
Leutenegger and Longo assured the Board that the batteries have never leaked and that the potential for the creation of hydrogen gas was infinitesimal to nonexistent.
One Board member questioned the Nynex experts as to health risks of the facility. In so doing, he referred to a 1975 report indicating that EMF fields are "definitely detrimental" but at what level the cause and effect occurs is unknown. Cornacchia was familiar with the report but indicated that in 1992 the study was repeated and no detriment was proven. Cornacchia also stated that in establishing the standards to which he had testified, the scientific community has provided over 6000 studies. The standards are reviewed every five years to determine whether they should be changed. A Board member challenged Cornacchia's qualifications to testify to health matters. Nynex's lawyer argued:
MR. BRUNO: We're not here to answer a medical question. What he is qualified to propose to the Board is testimony as to what federal and state have regulated as to acceptable levels of emissions and what the emission from this antenna will be, that the acceptable levels have been found by the authorities to be safe and are *606 used in a number of household products which Mr. Cornacchia can testify to. Based on those studies, and based on levels of emissions that this antenna will emit, you can draw your own conclusion when something is a thousand or so times less than the acceptable levels permitted by the federal and state government, you can draw your own conclusions as to whether or not they're safe or not. Mr. Cornacchia can provide his expert testimony from an engineering point of view.
Another member of the public observed that four or five men, fully covered in silver suits, were seen at the site on one occasion, suggesting prior contamination of the site. As no one had contacted the Township or Board, no member was able to address whether the men were there for a simulated test or to test for contamination.
At the point at which the second hearing was about to adjourn, on October 13, 1992, Nynex's lawyer asked whether the Board had any further concerns and whether any further evidence needed to be produced by it. No Board member expressed any further concern or suggested the need for any further evidence. However, the Board indicated that it was going to take a straw poll in order to give the attorneys some direction. Apparently a straw poll was taken off the record and the attorneys were advised that the application would be approved.
However, on November 12, 1992, the Board denied Nynex's application. In a resolution dated January 12, 1993, the Board made the following findings: (1) the project is not a public utility type; (2) the Board heard objections from residents regarding safety, security and health concerns; (3) Cornacchia admitted he was not a medical expert; (4) Township Committee liaison Walsh advised the Board that, due to the size of Hazlet, mobile communications would not enhance public health or safety and thus Nebenzahl's testimony regarding public health and safety was unpersuasive; (5) the Board was not persuaded that the proposal was of an inherently beneficial nature; (6) the variance relief requested cannot be granted without substantial detriment to the public good and without substantially impairing the intent and purposes of the zone plan and ordinance; (7) the property already has a nonconforming use, further exacerbation of the height variance will have a substantial adverse impact on adjacent property owners; *607 (8) there are less obtrusive, more appropriate locations for the antennae; and (9) the project adversely affects the zoning plan. Nynex filed a complaint in lieu of prerogative writ challenging the Board's action.
Upon a complete review of the testimony and exhibits and after hearing oral arguments, the trial judge, Judge Coogan, reversed the Board's decision. In his oral opinion, Judge Coogan held that the proposed use was "inherently beneficial." He then addressed the balancing of positive and negative factors under N.J.S.A. 40:55D-70d. He stated, "[o]ne senses in reading this transcript that no matter how many experts this applicant could have produced, the Board was not prepared to accept the reality of the telecommunications world of 1992 and 1993 and beyond. There is clearly in this record an identifiable public interest." He continued, stating that it stretched credulity to believe that an antenna between eight and a third to ten feet on top of a preexisting water tower and a building that is less than a thousand square feet would be aesthetically displeasing.
Judge Coogan further characterized as "rank speculation" that there were any health risks attendant to the radio emissions, based upon the testimony heard by the Board. He also noted that there was no testimony in the record to indicate the lack of benefit traditionally found when a commercial use is allowed in a residential zone. There are no noise or traffic problems and no credible testimony in the record addressed the diminution of values of neighboring properties.
In conclusion, Judge Coogan stated:
I am not unmindful of the requirement that a judicial review of a decision of a local Board of Adjustment is entitled to a presumption of validity. I am not unmindful that the standard against which the determination of the Board is made can only be reversed if the action below is deemed arbitrary, capricious and unreasonable. Added to that would be the question of whether or not there was or was not below a consideration of the extant law at the time. What fits into the arbitrary or capricious or unreasonable category is basically of no moment because the Court at this moment has to examine what was done below in light of the existing case law. In examining the decision below, in light of the law that existed at the time, I am satisfied this judgment below cannot stand. I'll reverse the determination of the *608 Board of Adjustment of the Township of Hazlet. Direct that the use variance and the bulk variance be granted.
This appeal by Hazlet ensued.
By state statute, a board of adjustment has the authority to grant a variance "to permit ... a use or principal structure in a district restricted against such use or principal structure [or] ... an expansion of a nonconforming use...." N.J.S.A. 40:55D-70d. "A nonconforming use is one which existed on property prior to the adoption of a zoning ordinance but which the ordinance does not now permit in the particular zone." William M. Cox, New Jersey Zoning and Land Use Administration § 11-1.1 at 75 (1993). Before a board of adjustment may grant a "d" variance, it must find "(1) that `special reasons' exist for the variance, and (2) that the variance `can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance.'" Burbridge v. Governing Body, 117 N.J. 376, 384, 568 A.2d 527 (1990) (citation omitted).
In Burbridge, the Supreme Court stated that "`special reasons' takes its definition and meaning from the general purpose of the zoning laws." Id. at 386, 568 A.2d 527. The purposes are listed in N.J.S.A. 40:55D-2. Pursuant to that section, "the zoning purpose most often relied on to prove special reasons in support of a use variance is `promotion of the general welfare,' N.J.S. 40:55D-2a." Cox, supra, § 7-2.1 at 110. Purposes that promote general welfare can be broken down into uses which are inherently beneficial and those which are not. Ibid. See Burbridge 117 N.J. at 386, 568 A.2d 527.
When a proposed use is "inherently beneficial," the positive criteria are deemed to be met. Sica v. Board of Adjustment, 127 N.J. 152, 603 A.2d 30 (1992). Our Supreme Court has suggested that municipal boards use a balancing test to arrive at a decision when a party has requested a variance.
First, the board should identify the public interest at stake. Some uses are more compelling than others.... Second, the Board should identify the detrimental *609 effect that will ensue from the grant of the variance. Certain effects ... will usually attend any nonresidential use in a residential zone. When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria .... Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use.... Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.
[Sica, 127 N.J. at 165-66, 603 A.2d 30 (emphasis added).]
This balancing test also applies to the grant of a variance to enlarge a preexisting nonconforming use. Grundlehner v. Dangler, 29 N.J. 256, 269, 148 A.2d 806 (1959). Each case is fact-sensitive. Sica, 127 N.J. at 165, 603 A.2d 30. "Variances to allow new nonconforming uses should be granted sparingly and with great caution since they tend to impair sound zoning." Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 275, 234 A.2d 385 (1967).
Applying these standards, a court must affirm a "municipal zoning board's decision unless it is arbitrary, unreasonable or capricious." Hawrylo v. Board of Adjustment, 249 N.J. Super. 568, 578, 592 A.2d 1236 (App.Div. 1991) (citing Kramer v. Board of Adjustment, 45 N.J. 268, 212 A.2d 153 (1965)). The decision of a board is presumptively valid. Sica, 127 N.J. at 166, 603 A.2d 30. Furthermore, a trial judge must give greater deference to a variance denial than to a grant. Cerdel Constr. Co. v. Township Comm., 86 N.J. 303, 307, 430 A.2d 925 (1981). Thus, an applicant bears a heavy burden in overcoming a denial.
Nynex argues that its proposed use is inherently beneficial. The trial judge agreed and so do we. To be sure, inherently beneficial uses tend to be noncommercial. Nonetheless,
various profit-making ventures have been deemed to be inherently beneficial. Examples of inherently beneficial commercial uses include private, for-profit senior citizen congregate-care facilities. Kunzler v. Hoffman, 48 N.J. 277, 288, 225 A.2d 321 (1966); Jayber, Inc. v. Township of W. Orange, 238 N.J. Super. 165, 174-75, 569 A.2d 304 (App.Div. 1990); a 120-bed nursing home, Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J. Super. 203, 212, 431 A.2d 163 (App.Div.), certif. denied, 87 N.J. 428, 434 A.2d 1099 (1981); a private day care nursery, Three L Corp. v. Newark Board of Adjustment, 118 N.J. Super. 453, 457, 288 A.2d 312 (Law Div. 1972); and a tertiary sewage treatment plant to serve a commercial trailer park, Wickatunk Village, Inc. v. Township of Marlboro, 118 N.J. Super. 445, 452, 288 A.2d 308 (Ch.Div. 1972).
[Sica, 127 N.J. at 159, 603 A.2d 30.]
*610 Improved telecommunications does not fall precisely within any of the previously recognized categories of inherently beneficial uses. However, a number of cases have addressed the public importance of improving telecommunications. In Yahnel v. Board of Adjustment, 79 N.J. Super. 509, 192 A.2d 177 (App.Div.), certif. denied, 41 N.J. 116, 195 A.2d 15 (1963), the Jamesburg Board of Adjustment recommended, and the borough council approved, a variance to permit the construction, in a residential zone, of a one-story brick and masonry building by the New Jersey Bell Telephone Company for equipment maintenance. Neighboring residence owners brought an action to set aside the variance. Id. 79 N.J. Super. at 511, 192 A.2d 177. They challenged the variance's validity "as a matter of zoning law." Id. at 516, 192 A.2d 177. The Law Division dismissed the appeal and we affirmed, stating that "[t]he `general welfare' test for a special reason has clear application here. Improved telephonic communications are obviously a subject matter of high relationship to the welfare of the entire community." Id. at 518, 192 A.2d 177.
In Alpine Tower Co. v. Mayor of Alpine, 231 N.J. Super. 239, 555 A.2d 657 (App.Div. 1989), plaintiff applied for a variance to allow the construction of a 4900 square foot building directly beneath a 400 foot transmission tower on a site that, in addition to the tower contained "a 100 foot tower with an out-of-service radar antenna, three buildings, three huts and three trailers" containing electronic equipment and a water tank. Id. at 242, 555 A.2d 657. This property was zoned residential, and the structures already located there were nonconforming. Ibid. Plaintiff later applied for permission to expand the 4900 square foot building to 6900 square feet to accommodate the equipment required to transmit. This application was denied, and plaintiff filed an action in lieu of prerogative writs. In reversing the decision of the Law Division, which had dismissed plaintiff's complaint, we opined that "[t]he regional public benefit derived from plaintiff's communications facility and the need for the proposed new building to house the sensitive modern electronic equipment used in the facility provide *611 additional grounds for special reasons." Id. at 249, 555 A.2d 657. Likewise in Sica, we identified the uses in Alpine Tower and Yahnel as "inherently" serving the public good. Sica, 246 N.J. Super. at 347, 603 A.2d 30.
Recent decisions of sister states have similarly concluded that cellular telephone communications facilities are to be treated as public utilities for zoning purposes. In Cellular Telephone Co. v. Rosenberg, 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993), the New York Court of Appeals affirmed a trial court determination that the plaintiff was a public utility and therefore was entitled to meet a lower standard than other applicants for a use variance. In reaching that conclusion, the New York Court found that a cellular telephone company is a public utility because it possesses certain characteristics.
A "public utility" has been defined to mean "a private business, often a monopoly, which provides services so essential to the public interest as to enjoy certain privileges such as eminent domain and be subject to such governmental regulation as fixing of rates, and standards of service" (2) Anderson, American Law of Zoning § 12.32 at 568-569 [3d ed]). Characteristics of the public utility include (1) the essential nature of the services offered which must be taken into account when regulations seek to limit expansion of facilities which provide the services, (2) "operat[ion] under a franchise, subject to some measure of public regulation," and (3) logistic problems, such as the fact that "[t]he product of the utility must be piped, wired, or otherwise served to each user * * *[,] the supply must be maintained at a constant level to meet minute-by-minute need[, and] [t]he user has no alternative source [and] the supplier commonly has no alternative means of delivery" (id., at 569).
We conclude that a cellular telephone company is a "public utility" as defined here and sufficiently possesses the characteristics outlined above. In addition, the construction of an antenna tower in a residential district to facilitate the supply of cellular telephone service is a "public utility building" within the meaning of a zoning ordinance (see, Matter of Payne v. Taylor, 178 A.D.2d 979, 578 N.Y.S.2d 327 [(1991)]).
[Cellular Telephone, 624 N.E.2d at 993.]
Likewise, in McCaw Communications Co. v. Marion County, 96 Or. App. 552, 773 P.2d 779 (1989), the appellate court agreed with the Land Use Board of Appeals that a 140 foot cellular transmission tower is a utility facility for zoning purposes. Id. 773 P.2d at 780. See also, Hawk v. Zoning Hearing Board, 152 Pa.Cmwlth. 48, 618 A.2d 1087 (1992) (holding that a provider of mobile *612 telephone communications is a public utility for zoning purposes although not subject to jurisdiction of Public Utility Commission and that evidence at the hearing supported a finding that the proposed communications tower would not endanger public health safety or welfare), appeal denied, 535 Pa. 625, 629 A.2d 1385 (1993), and Oldham County Planning & Zoning Comm'n v. Courier Communications Corp., 722 S.W.2d 904 (Ky. Ct. App. 1987) (holding that a mobile telephone service seeking to construct a 290 foot tower is a public utility as defined by state statute and that it is therefore not subject to the conditional use and dimensional ordinances of the planning unit).
While the statutory schemes under which these decisions were made are not the same as our own, the fundamental underpinnings of the decisions  that a cellular telephone company meets the criteria of a utility facility for zoning purposes  is equally applicable here. We are satisfied, as was Judge Coogan, that the coverage of gaps in and the improvement of mobile phone communications through the proposed facility along with the emergency benefits available through up-to-date cellular communications, are sufficient to meet the inherently beneficial use standard. Thus, under Sica, Nynex has established the affirmative criteria necessary to a "d" variance.
We also agree with Judge Coogan that when the Sica balancing of benefits and burdens of a proposed use takes place, the balance must be struck in favor of a grant. Nynex presented essentially uncontroverted evidence that the proposed use would not be substantially detrimental to the public good or impair the intent and purpose of the zone plan and zoning ordinance. As Judge Coogan concluded, extension of the antenna by eight to ten feet is aesthetically inconsequential and a minimal intensification of the nonconformity. Further, the use presents none of the traditional problems of commercial use in a residential zone  no traffic, noise or property value reduction issues exist. Moreover, the so-called health and safety issues are nothing but rank speculation. The experts rejected the possibility of a battery acid incident as *613 infinitesimal. The emissions are 3000 times less than the applicable standard and 500 times less than the most stringent standard in existence anywhere. Once Nynex proved conformity with the standard, if the Board wished to discount the standard, its obligation was to develop a record on the subject. This it did not do. In sum, the health and safety issues on which the Board relied were in the same category as the "men in silver suits" testimony, unsubstantiated fears which cannot form the basis for a denial of an otherwise viable application.
Affirmed.