697 A.2d 195

PIERCE ESTATES CORP., INC., PLAINTIFF–APPELLANT,
v. BRIDGEWATER TOWNSHIP ZONING BOARD OF
ADJUSTMENT, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted May 14, 1997—Decided August 4, 1997.

508

Before LONG, SKILLMAN and CUFF, JJ.

*Edward J. Johnson, Jr.*, attorney for appellant.

*Vastola & Fackelman*, attorneys for respondent (*Lawrence A. Vastola*, on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

Plaintiff Pierce Estates Corp. Inc. sought a variance pursuant to *N.J.S.A.* 40:55d–70, subd. d from defendant, Bridgewater Township Zoning Board of Adjustment (Board) to build a communications tower. The Board denied the variance. In an action in lieu of prerogative writs, Pierce challenged the denial which was upheld. This is an appeal from that decision.

The case began when Pierce filed a development application with the Board seeking the variances required for it to construct a radio tower on its property and to continue the existing two family dwelling use of the lot. A public hearing was held.

The following testimony was adduced at the hearing: Pierce owns property in the Township of Bridgewater known as lot 41 in block 7401 on the Bridgewater Township Tax Map, which property is located on Miller Lane (a private road) and consists of a 10.2 acre tract of land in the R–50 zone. The property is improved with a two story dwelling, a garage and a well house. Pierce seeks to erect a 343 foot high communications tower on the property. The tower would be located approximately 110 feet from the two family residential home owned by Pierce and approximately 610 feet from the northwestern corner of property located on Cram Trail and owned by David Wang, which is the closest residence to the property. The elevation of the tower would be 671 feet above sea level. There would be a roadway constructed to access the proposed tower, as well as an unmanned service building which would measure 12 feet by 42 feet and would be protected by a six foot high chain link fence. The tower would be supported by six guy wires anchored to the ground at six different locations and all of the anchors would be surrounded by six foot

high fences for security purposes. Pierce claims that "[t]he tower is designed in such a way that, should it collapse because of high winds or from any other cause, it will not do any damage to the only home which is in close proximity to the tower since the tower will fall like a 'carpenter's' collapsible ruler within itself and will not extend beyond the location of the various guy anchors, which support the tower."

A report prepared as part of Pierce's site plan application by James R. Housten, Jr., P.E., L.S., & P.P., indicates that: [1] (1) Wastewater management on this site will be apparently unaffected by this project; (2) no stream encroachment permits are required as part of the project; (3) the project will not generate any solid waste to be stored on the site; (4) the project will not have any impact on the region's air quality; (5) the project will virtually create no impact to the existing traffic patterns, other than construction traffic; and, (6) there are no wetlands on the site. Housten noted that "[t]he obvious unavoidable impact from this project will be the visual impact of the tower particularly from the south." He stated that this will be mitigated by "a very thin, inconspicuous profile" and tree clearing will be kept at a minimum. Housten reported two short term adverse impacts anticipated from the construction of the tower: (1) potential for increased soil erosion when the steep slopes are exposed during construction, which will be mitigated by soil and sediment control measures detailed on the site plan; and, (2) noise generated during the tower's erection, but this will be limited to daylight hours in accordance with Bridgewater's construction ordinances.

Sandy Drysdale, the owner of a communications service company, testified with respect to two-way radio systems, cellular phone systems and pager systems and indicated that there were certain communication "dead zones" in portions of the area to be serviced by Pierce's tower. Drysdale stated that she performed studies of the area in question in an effort to see what is provided by the

---

[1] Housten testified before the Board on November 15, 1994.

existing tower and what would be provided by the proposed tower. She also "talked with people at Somerset County Medical Center . . . the people at Bridgewater Police . . . the office of emergency management at Somerset County . . . personnel at Bridgewater OEM and with Public Service Electric & Gas Company, all of which have communication problems." She indicated that the height of the tower is needed to overcome an obstruction from a mountain ridge which inhibits communications. She further stated that plaintiff's tower would not serve as a duplicative coverage source, but rather an "overlay" or "continuation." She explained that

[w]hat they're trying to do is create a seamless communication network so that you don't have dead areas so that in public safety, a police officer can communicate with his portable, which is a big problem right now. . . .

. . . .

. . . The benefit of this site is because of its location, its height and the fact that it has the ability to cover areas that are not now covered.

On cross-examination, Mrs. Drysdale admitted that as of the time of the hearing, the County was not interested in using the tower for 911 communications; the police reported no need for the tower; there was no signed contract or letter of intent from any prospective user of the tower; nor was there actual testing performed with respect to the project.

John Haelig, the president of Pierce, indicated that he purchased title to the property in 1980 from his aunt. In describing the idea for the tower project, he stated:

I proceeded into the tower project because I had noticed that in various communities, various companies were making applications for towers and I felt that if I were to build—they need a tower, they need antennas, and I felt if I could build one tower in one place in an area accessible to them by line of sight and other ways, that it would be more economically feasible for them to pay rent for the tower for their antenna then it would be to build and maintain their own tower.

While Haelig represented that there are persons interested in the tower, he acknowledged that he had no firm commitments or contracts. In fact, he testified that the police department and the local medical center did not currently indicate a need for the tower, although the people in charge of the 911 operations asked

him to keep them informed of the tower's progress, again without any form of commitment. When asked about his discussions with the County regarding the 911 area system, Haelig responded:

The County 911 system has never been fully developed. I have expressed to them what my plans are and I have expressed to them that as a result of Mrs. Drysdale's test, our indications are that completing the tower, we could tie together the entire 911 system including Bernardsville, Far Hills, Bedminster, the north eastern end of the township including Millington, Basking Ridge area, the extreme end of the township in North Plainfield and we could form a line of sight to their proposed center on Rowfield Road. We have line of sight from this property to the Royce Field property.

Clarence Beverage, a broadcast engineer, testified that the proposed tower would eliminate the "dead spots" which Drysdale said existed.

Kenneth Nelson, the professional planner retained by Pierce, indicated in his testimony that the public good would be minimally impacted by the proposed tower, and that the zone plan and the master plan would not be impaired. He also stated:

The tower in question based on the testimony that has been provided by other witnesses would indicate that this tower is important in terms of filling a gap in terms of helping to further build that seamless communication.

. . . .

It will enhance the health, safety and welfare of the community. It is an appropriate location for this type of use and it is an efficient use of the land. The height is needed to provide the service that is contemplated which will include a variety of two-way radio communication antennas, paging facilities and potentially cellular telephone facilities as well as the 911 service that the applicant has indicated he would certainly allow on the tower.

. . . .

The public will benefit in various ways, not just as an example with respect to the 911 system which deals directly with health and safety, but with the convenience and productivity that this facility will offer to various businesses and private individuals as a result of its existence.

Nelson also stated that although the tower would be visible from certain areas in Bridgewater, the visual impact would not be dominant or overpowering, especially in light of its narrow profile, the wooded hillside, and the coloring of the tower which is being painted in an effort to make it blend in with its surroundings.

Mark Tinder, a real estate appraiser, offered testimony that there was no evidence of any adverse impact on economic or real estate values based on the proximity of land to a tower. Additionally, Frank Bencivengo, the objectors' real estate expert, testified that the impact on property value 800 feet from the tower would be "very little, if any," although he didn't know for certain as he hasn't studied "every tower and every neighborhood."

Pierce sought the following relief from the Board:

1.  A use variance because radio communication towers are not allowed in the R–50 zone.

2.  A variance to allow two structures to be located on one lot.

3.  A frontyard setback variance (the frontyard setback is presently 35 feet and 75 feet is required).

4.  A height variance is requested since the height of the tower is proposed to be 340 feet and the allowable height of the tower would be 172 feet, based upon the distance of the tower to the nearest property line.

5.  A variance for lot coverage on steep slopes (9,164 square feet is allowed and 10,378 square feet is proposed).

6.  A steep slope variance (the slopes are greater than 30% where the tower is proposed to be built).

7.  A variance to allow construction since the proposed property fronts on an unapproved and private right of way.

The Board denied Pierce's application. In its Resolution, the Board stated:

> The applicant is not in the business of providing telecommunications but proposes a tower which would be made available to any company or governmental agency in need of such a facility. The Board concludes that in order to apply the inherently beneficial standard the applicant must demonstrate that a public need is being served. A proposal to erect a tower is not in and of itself a use which inherently benefits the public good. While the applicant presented testimony that the site might be suitable for Public Service Electric and Gas Company, Somerset Hospital, the Bridgewater Police Department and Rescue Squad there was no testimony that any of these potential users had expressed interest in the site or that their needs could not be satisfied at another site or by the modification of any existing tower such as that owned by Somerset County which is in close proximity to the subject property.

Additionally, the Board found that there were no special reasons for the granting of this variance, considering, among other things, the possibility of modification of another tower in close proximity and the need for significant tree removal.

The trial judge, the Honorable Judge Robert E. Guterl, J.S.C., affirmed the Board's decision, stating in part:

> The *Nynex* case [2] ... is distinguished based upon the fact that there the applicant was in the business of providing telecommunications, while Pierce is not. Although Pierce offered testimony from a number of witnesses and mentioned public service entities, such as local police departments and the Somerset County 911 program, none of these entities have contracted to use the facilities and it is speculative that the tower will benefit any of them.
>
> While it is clear that the tower will be useful for business, such use would not meet the "inherently beneficial" criteria. It is clear from the testimony that the proposed tower has great potential to benefit the public welfare, but it is speculative nonetheless. While in *Nynex* the applicant demonstrated its proposal was part of a seamless network, Pierce can only hope for such a profitable use....
>
> Pierce also argues that other "special reasons" required the grant of this variance.... It is not surprising that the Board was not convinced.... Pierce was held to an enhanced burden of proof under *Medici v. BPR Co.*, 107 *N.J.* 1, 526 *A.*2d 109 (1987). In denying the application on this ground, the Board relies upon the fact that the tower utilizes protected steep slopes and would provide an adverse visual impact to other properties in the neighborhood. There is no need to resolve the issue of whether Pierce has properly satisfied the negative criteria, since the Board is found to have denied the application for the use variance on proper grounds.

Pierce appeals from this decision on the ground that it is arbitrary, unreasonable and capricious. We disagree and affirm.

## I

■ The decision of a zoning board should be sustained by a reviewing court if it is founded on adequate evidence; the decision will be set aside only if it is arbitrary, capricious, or unreasonable. *Burbridge v. The Governing Body of the Township of Mine Hill*, 117 *N.J.* 376, 385, 568 *A.*2d 527 (1990). Given its "peculiar knowledge of local conditions," a board must be accorded wide latitude in the exercise of its delegated discretion. *Kramer v. Board of Adjustment, Sea Girt*, 45 *N.J.* 268, 296, 212 *A.*2d 153 (1965). However, because use variances tend to impair sound zoning, they should be granted sparingly and with great caution. *Burbridge, supra*, 117 *N.J.* at 385, 568 *A.*2d 527; *Kohl v. Mayor of*

[2] *Nynex Mobile Communications Co. v. Hazlet Township Zoning Bd. of Adjustment*, 276 *N.J.Super.* 598, 648 *A.*2d 724 (App.Div.1994).

*Fair Lawn,* 50 *N.J.* 268, 275, 234 *A.*2d 385 (1967). For this reason, "a trial judge must give greater deference to a variance denial than to a grant." *Nynex Mobile Communications Co. v. Hazlet Township Zoning Bd. of Adjustment,* 276 *N.J.Super.* 598, 609, 648 *A.*2d 724 (App.Div.1994). Consequently, "an applicant bears a heavy burden in overcoming a denial." *Ibid.*

Pursuant to *N.J.S.A.* 40:55D–70(d), a use variance will be granted if: (1) "special reasons" exist and (2) the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." *See Sica v. Board of Adjustment of the Township of Wall,* 127 *N.J.* 152, 155–56, 603 *A.*2d 30 (1992); *Burbridge, supra,* 117 *N.J.* at 384–85, 568 *A.*2d 527. Proof of both positive and negative criteria is required by the statute. *Sica, supra,* 127 *N.J.* at 156, 603 *A.*2d 30.

The statutory phrase "special reasons" has been broadly defined as those criteria that promote the purposes of zoning, *see N.J.S.A.* 40:55D–2, with the promotion of the general welfare being the zoning purpose which "most clearly amplifies the meaning of special reasons." *Medici v. BPR Co.,* 107 *N.J.* 1, 18, 526 *A.*2d 109 (1987). However, where the use is not of a type which itself provides special reasons, there must be a finding that the general welfare is promoted because the proposed use is particularly suited to the location for which the variance is sought. *Kohl, supra,* 50 *N.J.* at 279, 234 *A.*2d 385. Otherwise, "if the general social benefits of any individual use—without reference to its particular location—were to be regarded as an adequate special reason, a special reason almost always would exist for a use variance." *Id.* at 280, 234 *A.*2d 385.

When a proposed use is "inherently beneficial," special reasons are said to exist and the positive criteria are met. In other words, applicants for such uses are deemed to meet the test of promoting the general welfare without proof that the proposed site is particularly suitable for the proposed use. *Sica, supra,* 127 *N.J.* at 165, 603 *A.*2d 30; *Nynex, supra,* 276 *N.J.Super.* at 608, 648

*A*.2d 724. Inherently beneficial uses are usually non-commercial, non-profit and service oriented. *Nynex, supra,* 276 *N.J.Super.* at 609, 648 *A*.2d 724. However, certain profit-making ventures have been considered to be inherently beneficial. *Ibid.* These include a private, for-profit senior citizen facility, a 120–bed nursing home, a private day care center, and a sewage treatment plant which served a commercial trailer park. *Sica, supra,* 127 *N.J.* at 159, 603 *A*.2d 30; *Nynex, supra,* 276 *N.J.Super.* at 609, 648 *A*.2d 724.

■ Pierce argues that the recent decision by this Court in *Nynex, supra,* supports the conclusion that the proposed tower is an inherently beneficial use. In *Nynex,* we upheld a trial judge's determination that the applicant had proved that the uses to which its proposed mobile communications facility were to be put were inherently beneficial. *Nynex, supra,* 276 *N.J.Super.* at 609–12, 648 *A*.2d 724. In so doing, we recognized the public importance of improving telecommunications, tracing the progression of this concept from *Yahnel v. Board of Adjustment of Jamesburg,* 79 *N.J.Super.* 509, 518, 192 *A*.2d 177 (App.Div.), *certif. denied,* 41 *N.J.* 116, 195 *A*.2d 15 (1963), in which we stated that "[i]mproved telephonic communications are obviously a subject matter of high relationship to the welfare of the entire community," through *Alpine Tower Co. v. Mayor of Alpine,* 231 *N.J.Super.* 239, 249, 555 *A*.2d 657 (App.Div.1989), in which we opined that "[t]he regional public benefit derived from plaintiff's communications facility and the need for the proposed new building to house the sensitive modern electronic equipment used in the facility provide additional grounds for a finding of 'special reasons.'" *Nynex, supra,* 276 *N.J.Super.* at 610–11, 648 *A*.2d 724. We also took note of *Sica v. Board of Adjustment,* 246 *N.J.Super.* 338, 347, 587 *A*.2d 661, 666 (App.Div.), certif. granted, 126 *N.J.* 334, 598 *A*.2d 892 (1991), reversed by, *Sica v. Board of Adjustment,* 127 *N.J.* 152, 603 *A*.2d 30 (1992), where it was specifically recognized that the uses in *Yahnel* and *Alpine Tower* "inherently serve the public good."

Pierce's position in this case appears to arise out of a misreading of *Nynex.* It apparently views *Nynex* as establishing that any proposal to build a communications tower automatically vaults the "inherently beneficial" threshold. Not so. A mobile communica-

tions tower is nothing more than a structure. As with any other structure, its proponent bears the burden of proving that the use to which it will be put meets the statutory criteria. To be sure, *Nynex* recognized improved telecommunications as inherently beneficial; however, this does not end the inquiry. Where, as here, the proponent postulates that its proposed tower will improve telecommunications, it must prove that the tower will actually have that effect in order to meet the inherently beneficial standard. That is what occurred in *Nynex* where the plaintiff, who was in the business of providing telecommunications, proved that its tower would be utilized to fill identified gaps in service coverage, improve mobile phone communications, and provide real emergency benefits. *Nynex, supra,* 276 *N.J.Super.* at 612, 648 *A.2d* 724. Here, on the other hand, as the Board and the trial judge concluded, Pierce was simply unable to show that any public need would actually be served by the proposed tower.

## II

■ After determining that the uses to which the proposed tower were to be put were not inherently beneficial, the Board concluded that Pierce had also failed to establish that the tower was particularly suited to the location for which the variance was sought. Judge Guterl agreed, noting that the testimony was unconvincing in demonstrating the particular uniqueness of the property to the use:

> For example, the topographical conditions are referred to but it seems evident that there was other property with even superior topography. The rugged terrain and isolation of the property are also said to contribute to the suitability of this property, but it is difficult to understand or believe this ruggedness is either unique or helpful to the applicant. This is not a high traffic application and the negative visual impact is certainly not the greatest with respect to nearby properties, but rather is clearest from some distance.

In our view, there was ample evidence to support the Board's finding that the use was not particularly suited to the location for which the variance was sought. *See Kohl, supra,* 50 *N.J.* at 279, 234 *A.2d* 385. In sum, the determination of the trial judge that

the Board's decision was neither arbitrary, capricious nor unreasonable is legally unassailable.

Affirmed.