701 A.2d 1281

NEW BRUNSWICK CELLULAR TELEPHONE COMPANY, D/B/A COMCAST CELLULAR ONE, PLAINTIFF–RESPONDENT, v. BOROUGH OF SOUTH PLAINFIELD BOARD OF ADJUSTMENT, DEFENDANT–APPELLANT, AND TED DABROWSKI, KAZ DABROWSKI, KARL KOLAR, SALLY KOLAR, VINCENT J. DOTOLI AND LOUISA DOTOLI, INTERVENORS–APPELLANTS.[1]

Superior Court of New Jersey
Appellate Division

Argued September 24, 1997—Decided October 17, 1997.

[1] These appeals have been consolidated for the purposes of this opinion only.

152

D'Annunzio, J.A.D., dissented and filed opinion.

---

154

Before Judges SHEBELL, D'ANNUNZIO and A.A. RODRIGUEZ.

*James F. Clarkin, III* argued the cause for defendant-appellant (*Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C.*, attorneys; *Mr. Clarkin,* on the brief).

*David J. Frizell* argued the cause for Vincent J. Dotoli, attorney for intervenors-appellants.

*Gregory J. Czura* argued the cause for plaintiff-respondent.

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

In December 1994, New Brunswick Cellular Telephone Company d/b/a Comcast Cellular Communications ("Comcast") applied to the South Plainfield Board of Adjustment ("Board") for variances necessary to erect an unmanned cellular communications facility at 313 Durham Avenue, South Plainfield, located in the M–3 zone. The proposed facility was to consist of a four hundred and fifty-six (456) square foot shelter housing radio equipment, and a ninety (90) foot high steel monopole with up to twelve 12″ by 54″ panel-type antennas.

The Board conducted hearings on the application on February 7, 1995, April 4, 1995, and May 2, 1995. At the February 7 Hearing, Comcast presented expert testimony from Seth Parkoff, a radio frequency engineer; Alice Fahy–Elwood, a radiation protection specialist; and Janice Talley, a senior planner. Vincent J. Dotoli, Esquire, appeared representing himself and other objectors, all South Plainfield property owners within sight of the proposed tower. Several members of the local community that attended the meeting spoke against the proposal.

At the April 4, 1995 hearing, objectors' counsel completed the cross-examination of Ms. Talley. The objectors then presented their own witnesses, including Richard Wolf, a telecommunications

consultant; and John T. Chadwick, a professional planner. Comcast's counsel cross-examined these witnesses.

Comcast presented two rebuttal witnesses at the May 7, 1995 hearing: David Stern, Comcast's director of wireless systems engineering and Roger F. Grutzmacher, a partner in the firm of JGH Architects. At the conclusion of the May 2, 1995 hearing, the Board denied Comcast's use variance application by a unanimous vote of 7–0. The Board's findings were memorialized in a written resolution of the same date.

On June 4, 1995, Comcast filed a complaint in lieu of prerogative writs challenging the use variance denial. The action was tried on September 29, 1995 and May 24, 1996. On the later date, the Law Division judge rendered his oral opinion and overturned the denial of the variances and ordered approval of Comcast's application. The Board and objectors appeal.

The M–3 zone is the least restrictive use zone in South Plainfield. The zoning ordinance provides as follows with respect to the uses permitted in the M–3 Zone:

A. All uses permitted in the M–1 Zone.

B. The manufacture, fusing and production of quartz and of silica and quartz products; the manufacture of electrical instruments and electrical components; the manufacture and production of all types of precious and base metals and alloys in ingot form, refining, melting, casting and working of precious and base metals and alloys; manufacture and production of precious base and alloy metal products, including processing, milling, machine fabrication and assembling; manufacture and production of non-hydrocarbon chemical and catalyst products, plating compounds and solutions, diamonds and other precious stone products, brazing fluxes, light metal parts, liquid gold and other precious and base metal organic based paints, casting compounds and cements, gas measuring equipment and gas generating and storage equipment.

C. Warehouse and distribution center, including sales at retail of a "clearance" nature, provided however that such sales activities occur not more frequently than one every quarter for a period, in each case, of not more than seven (7) consecutive days duration.

D. Lumber yards.

E. Residential uses are expressly prohibited.

(South Plainfield Zoning Ordinance, sec. 710.1 (1992)).

The uses permitted in the M–1 Zone are:

A. Office buildings for executive, administrative, business, educational or professional purposes.

B. Scientific or research laboratories devoted to research, design and/or experimentation; process and fabricating incidental thereto may be permitted.

C. Uses of a light manufacturing nature as follows:

(1) Manufacturing of light machinery comprising any of the following: carburetors, and small machine parts; cash registers; sewing machines; and typewriters, calculators and other office machines.

(2) Fabrication of metal products comprising any of the following: baby carriages, bicycles and other non-motorized vehicles; metal furniture; musical instruments; sheet metal products; and toys.

(3) Fabrication of paper products comprising any of the following: bags, bookbinding; boxes and packaging materials; office supplies; and toys.

(4) Fabrication of wood products comprising any of the following: boats, boxes, cabinets and wood workings; furniture and toys.

(5) Food and associated industries comprising any of the following: bakeries; bottling of food and beverages; food and cereal mixing and milling; food processing; food sundry manufacturing; and ice cream manufacturing.

(6) Other permissible industry comprising any of the following: concrete and plastic products; electronic products; glass and glass products manufacturing; jewelry manufacturing, including polishing; leather goods manufacturing, except curing, tanning and finishing of hides; motion picture exchange, pharmaceutical products manufacturing.

D. Residential uses are expressly prohibited.

(*Ibid.* at sec. 708.1).

The M–2 Industrial Zone includes as a permitted use "Television and Radio Studios and Antennas." (South Plainfield Zoning Ordinance, sec. 709.1C). This zone is located several hundred yards from Comcast's selected site, and is immediately adjacent to Route 287. Cellular communication towers are clearly not a permitted use in the M–3 Zone and, therefore, Comcast required a use variance. It also required a bulk variance in that the proposed height of ninety (90) feet exceeded the height limitation in the M–3 Zone.

*N.J.S.A.* 40:55D–70d, provided at the time, in pertinent part:

In particular cases and for special reasons, (a board of adjustment may) grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard ... pertaining solely to a conditional use, (4) an increase in the permitted floor area ratio ..., (5) an increase in the permitted density ...,

except as applied to the required lot area for a lot or lots for detached one or two dwelling unit buildings, which lot or lots are either an isolated undersized lot or lots resulting from a minor subdivision or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure. A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board ...

...

No variance or other relief may be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance. (*N.J.S.A.* 40:55D–70d, *amended by L.* 1991, c. 256).

Seth Parkoff, Comcast's radio frequency engineer, first gave a brief overview of how cellular communications work and the concept of "frequency reuse." He explained that there was a two-fold purpose for building the proposed facility. The first purpose was to increase communications capacity along Route 287 and the Middlesex Mall. The second purpose was to improve the efficiency of the system by improving the quality of the user "hand-off" between signal towers. Parkoff testified that the ninety foot proposed height of the monopole was necessary in order to achieve the desired increased capacity and efficiency.

According to Parkoff, this site is in the "dead center" of a "search area" about "a half mile in diameter" selected by Comcast. He said that after a search area is created, Comcast's policy is to look for existing towers to co-locate with, examine the terrain and other factors that could affect the height of the tower, and to determine what real estate is available. He was aware of two other towers in the immediate area, both of which were, in his opinion, not sufficient for Comcast's purposes. One of the towers, owned by an excavation company, was located next to the chosen site but could not support the load of Comcast's antennas. The other tower, about two miles from the chosen site, owned by Nextel, was unacceptable because it fell outside the search ring area. Comcast evaluated ten locations within the search ring, and the chosen site "was one of the best ones; and, in the end, the only one that was available." Comcast would not provide these ten locations when requested by Attorney Dotoli. Comcast's

counsel maintained that under *Sica* [2] alternate sites are not probative or relevant.

Parkoff testified that there are other technological options that Comcast was "trying to implement" in order to increase capacity. These technologies include digital communication, which "has the potential of tripling or multiplying by ten the number of channels" available, and micro cells, whereby small, unobtrusive antennas are placed at very low levels in order to obtain coverage.

Richard Wolf was presented as the objectors' technological expert. Wolf noted that the cellular phone industry in the South Plainfield area is very competitive, and that the three major competitors, Comcast, Bell Atlantic Mobile, and Nextel, operate on a "for-profit" basis. He stated that the towers currently operate under an "analog system." He offered several reasons why the proposed Comcast tower should not be approved. First, he stated that there is no technological reason why Comcast could not use the Nextel tower or reinforce the existing tower located adjacent to Comcast's proposed site. He also discussed the use of "mini cells" or "micro cells" as "a way of providing service to a limited geographical area." These are placed where there are "high concentrations of people" such as "in a mall site or inside a building" or other "hot spots where people are demanding a lot of service."

Wolf also stressed the change in system design to digital technology, which multiplies a system's capacity potential by a factor of 20. He said communication towers built within the past four to five years are equipped to handle both analog and digital technology. He estimated that "probably ten to twenty percent of the calls being carried in this country are digital," and by this time next year, 50 percent of the calls will be digital. He noted that Comcast and "[a]ll of the wireless carriers are going to digital . . .

[2] *Sica v. Board of Adjustment of Tp. of Wall*, 127 *N.J.* 152, 156, 603 A.2d 30 (1992).

to increase their capacity and so they don't have to put up new towers."

Comcast offered David Stern, a Comcast director of wireless systems engineering, as a rebuttal witness. He testified that the Nextel tower "falls 1.75 miles away from the center of the search area and a mile and a quarter away from the edge of the search area. So it does not meet the criteria." He stated that the design criteria was to improve signal strength along Route 287 and Middlesex Mall, and that the Nextel site would not improve the signal strength in this area. He also indicated that the tower structure on the lot adjacent to the proposed site could not be used without being replaced. He stated that only a micro cell in "each and every one of the locations" that Comcast was targeting would improve coverage in those areas. He estimated digital technology would increase capacity by a factor of five to eight times. He admitted it is technologically possible for an engineer to locate an antenna on the Nextel tower and still cover the Route 287 area and the Durham Avenue area, and that it would not be difficult from an engineering standpoint to replace the tower adjacent to the proposed site.

Comcast also offered the testimony of Janice Talley, a planner, who stated that the M–3 Zone was the most permissive zone in the area. She provided a general description of the surrounding area and presented a photographic exhibit illustrating what the proposed monopole would look like. She asserted the facility would be unmanned, have virtually no-traffic except for one maintenance visit per week, have an adequate entrance and exit, would require no water or sewer lines, would not emit any distracting noise, and would produce radio frequency emissions 2700 times lower than required by State regulations.

Talley argued that according to New Jersey law a cellular phone tower is an "inherently beneficial use" and, therefore, the positive criteria for the use variance must be considered satisfied. She stated that placing the antenna on the proposed site would not create a significant impact considering the industrial uses permit-

ted within the M-3 Zone. She also stated that there are no detrimental impacts from the proposed use and, in considering the public interest considerations in communications, any negative aspects of the proposed use are outweighed by the positive aspects. She acknowledged that the social and beneficial purposes for manufacturing zones, like the M-3, are to permit manufacturing and industrial-type activities, which create a "good employment base" as well as a "fairly solid ratable base." She agreed Comcast's proposed site would not bring any jobs to South Plainfield, and was only a "marginal ratable."

The objectors called John Chadwick as an expert in professional planning. He opined that some inherently beneficial uses are more compelling than others. He would rank "low or moderate cost housing" high on a list of inherently beneficial uses, and "cellular towers" at the lowest end of such a list. He noted that, from a planning perspective, the use of the site will not conform to the zoning objectives of the community. He described the area as "in transition" from farmland and scattered residential development to a manufacturing and office corridor connected with Route 287. As an area in transition, it would be more vulnerable to an adverse impact from the placement of a cellular tower than a zone that has already been fully developed. He opined that "the manmade conditions in the area or the physical conditions of the land don't support, in my opinion, the testimony that the site was selected based on the topographic condition, because the elevation is clearly lower than the surrounding areas." [3] He concluded that the proposed tower "will contribute to [the M-3 Zone's] development at a much lower level than anticipated under the zoning plan from the standpoint, again, in terms of jobs, in terms of improvements of the sites for buildings and, therefore, revenue flows to the municipality."

---

[3] This fact had previously been given by Comcast's witness as a reason for the height requirement of 90'.

In unanimously voting to deny the application, the Board adopted a resolution, dated May 2, 1995, which lists nineteen "findings" and eleven "conclusions," as follows:

## FINDINGS

1. [Comcast] ... is the Lessee of a portion of the property known as and located at 313 Durham Avenue, also known as Lot 9, in Block 488 in the Borough of South Plainfield.

2. The premises in question is 133,294 square feet and presently being used as heavy machinery repair and storage located in the M–3 Zone.

3. The applicant is requesting a use variance to construct an unmanned Cellular Telecommunications facility ... [gives dimensions] ...

4. [Comcast] ... testified that the proposed antenna would assist in increasing the capacity and coverage (signal strength) on their present cellular communications systems.

5. [Comcast] ... testified that the site in question, which is located on a threshold street, in the general area of the intersection of Durham Avenue and Route 287, was one of many sites they considered for the proposed ... facility.

6. [Comcast] ... refused to disclose the identity of the other location[s].

7. [Comcast] ... admitted that the site in question was lower than some of the other alternative sites.

8. [Comcast] ... also admitted that selecting an alternative site that was more elevated may allow ... [them] to reduce the overall height of the antenna.

9. There is an antenna of the approximate size required by Comcast within the immediate area of the site which could have been modified or reconstructed to accommodate the communications needs of ... [Comcast].

10. The area immediately surrounding the [site] ... is an area in transition, at the very threshold of a significant amount of the motor vehicle traffic into South Plainfield and vulnerable to inappropriate development.

11. Substantial deviations from the Zoning Plan in this area could have a permanent adverse effect on the municipal planning for this area.

12. The objectors to the application offered expert testimony that some of the existing towers in the general area (including Nextel Tower) could provide the required service requested by the applicant.

13. The expert witnesses ... indicate a digital technology will increase the capacity of existing transmission facilities for a minimum of five times to a maximum of twenty times their existing capacity.

14. [Comcast] ... testified that it would be changing to digital technology over the next two years.

15. Digital technology would significantly decrease the need for towers similar to the one proposed in this application.

16. The Board agrees with the finding of [Chadwick] ... that the erection of this facility would detract from future development of the area ...

17. The Board agrees with [Chadwick] that the facility in question would be esthetically ... unpleasing to both [sic] future development of the area.

18. [Comcast] ..., through its witnesses, acknowledges that the anticipated introduction of digital communication technology had significantly decreased in need for the monopoles of the proposed height.

19. [Comcast] ... acknowledges that it was possible to accomplish some of its intended capacity and coverage goals, especially for stationary users, by the use of micro cells within the intended area.

## CONCLUSIONS

1. [Comcast] ... has failed to demonstrate that the relief can be granted without substantial detriment to the intent and purpose of the Zoning Ordinance and Zoning Plan, being a deterrent to the permitted use development of the area in question.

2. [Comcast] ... has failed to demonstrate that the relief requested can be granted without substantial detriment to the public good, being an esthetic detriment to a main corridor within the Borough.

3. [Comcast] ... offered no conditions that would ameliorate the negative impact upon the public good and the intent and purpose of the Zoning Plan and Zoning Ordinance.

4. The detriment to the public good, the Zoning Plan and Zoning Ordinance, outweighs the public interest of the use.

5. It is the determination of the Board that the desired goal to the capacity and coverage for the mobile telecommunications system, can be accomplished in other ways which would not adversely impact upon public good or the intent and purpose of the Zoning Ordinance or Zoning Plan.

6. The site in question is inappropriate for the proposed use.

7. The proposed use on the site in question would have a substantially adverse impact on the zoning and planning of the Borough of South Plainfield.

8. The proposed use does not provide public benefit, but simply provides additional service to customers of Comcast.

9. The Board determined that the inherent beneficial characteristic of the proposed use is significantly less compelling than other types of inherently beneficial uses such as churches, schools, hospitals, low and moderate income housing, day care centers, etc.

10. The increased service which may result from the proposed use could be accomplished by other means such as micro-cells, using existing towers and digital technology.

11. The significant detriment to the Borough and the Zoning Plan and Zoning Ordinance should not be outweighed by the minimal inherent beneficial characteristic of the application.

When courts review a decision to grant a variance, they must recognize that the Legislature has vested the municipality with discretion to make the decision involved. *Booth v. Board of Adj., Rockaway Tp.*, 50 *N.J.* 302, 306, 234 *A.*2d 681 (1967). Therefore, a rebuttable presumption exists that the municipality has properly exercised its discretion or, in other words, the decision of a board is presumptively valid. *Harvard Enterprises, Inc. v. Board of Adj. of Madison Tp.*, 56 *N.J.* 362, 368, 266 *A.*2d 588 (1970); *Nynex Mob. Comm. Co. v. Hazlet Tp.*, 276 *N.J.Super.* 598, 609, 648 *A.*2d 724 (App.Div.1994). The trial court may not substitute its judgment for that of the municipal body unless the board's action was arbitrary, unreasonable, or capricious. *See, e.g., Harvard Enterprises, supra*, at 368, 266 *A.*2d 588; *Kramer v. Board of Adj. of Sea Girt*, 45 *N.J.* 268, 296–97, 212 *A.*2d 153 (1965). On appeal, this court must give deference to the municipality's broad discretion and reverse only if the action was arbitrary, capricious or unreasonable. *Booth, supra*, 50 *N.J.* at 306, 234 *A.*2d 681; *Kramer, supra*, 45 *N.J.* at 296–97, 212 *A.*2d 153.

To obtain a use variance under *N.J.S.A.* 40:55D–70d, an applicant must prove both "positive" and "negative" criteria. Under the positive prong, an applicant must establish that "special reasons" exist for the grant of the variance. *Sica, supra*, 127 *N.J.* at 156, 603 *A.*2d 30. Under the negative prong, an applicant must prove that the variance " 'can be granted without substantial detriment to the public good' and that it will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.' " *Id.* (quoting *N.J.S.A.* 40:55D–70d, *amended by L.* 1991, *c.* 256).[4]

When determining the positive prong under the *Sica* test, if the proposed use is classified as an "inherently beneficial use," there is no requirement that the site be particularly suitable, or that it not be used for a permitted use. *Sica, supra*, 127 *N.J.*

---

[4] During the pendency of this appeal, *N.J.S.A.* 40:55D–70c & d have been amended by L.1997, c.145, effective June 30, 1997.

at 160, 603 *A.*2d 30; *DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N.J.* 428, 440, 267 *A.*2d 31 (1970); *Kunzler v. Hoffman,* 48 *N.J.* 277, 225 *A.*2d 321 (1966). While, under *Medici v. BPR Co.,* 107 *N.J.* 1, 21, 526 *A.*2d 109 (1987), an applicant seeking a use variance for a commercial purpose must establish by enhanced proof that the variance is not inconsistent with the intent and purpose of the master plan and zoning ordinance, *Sica, supra,* held that the "enhanced proof" standard does not apply to inherently beneficial uses. 127 *N.J.* at 155, 603 *A.*2d 30.

Although inherently beneficial uses are generally non-commercial, various for-profit uses have been deemed inherently beneficial. *See e.g., Sica, supra,* 127 *N.J.* at 159, 603 *A.*2d 30 (head-trauma center); *Kunzler, supra,* 48 *N.J.* at 288, 225 *A.*2d 321 (senior citizen congregate-care facility); *Jayber, Inc. v. Township of W. Orange,* 238 *N.J.Super.* 165, 174–75, 569 *A.*2d 304 (App.Div. 1990) (senior citizen facility); *Urban Farms, Inc. v. Borough of Franklin Lakes,* 179 *N.J.Super.* 203, 212, 431 *A.*2d 163 (App.Div.), *certif. denied,* 87 *N.J.* 428, 434 *A.*2d 1099 (1981) (a 120–bed nursing home). Although our Supreme Court has not directly addressed the issue, we have held that cellular communication sites, like the one involved here, are inherently beneficial. *Nynex, supra,* 276 *N.J.Super.* at 610–11, 648 *A.*2d 724; *see also Kingwood Township Volunteer Fire Co. Number One v. Board of Adjustment of the Township of Kingwood,* 272 *N.J.Super.* 498, 505, 640 *A.*2d 356 (Law Div.1993).

■ Under *Sica,* the analysis for balancing the positive and negative criteria when considering an inherently beneficial use requires four discrete tasks.

First, the board should identify the public interest at stake. Some uses are more compelling than others....

Second, the Board should identify the detrimental effect that will ensue from the grant of the variance....When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria....

Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.

Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.

[*Sica, supra*, 127 *N.J.* at 165–66, 603 *A.*2d 30 (*citations omitted* ).]

On June 30, 1997, the Governor signed into law amendments to *N.J.S.A.* 40:55D–70c & d (*L.* 1997, *c.* 145) that were intended to counteract what the Legislature perceived as a trend whereby courts would make a determination that a use was inherently beneficial, and then require that the variance simply be issued, regardless of the local board's analysis under the statute. (Note to the Senate, Summary of Senate Bill 824, in which "cellular towers" were specifically mentioned as being implicated). The amendment was designed to clarify "that it is not enough for a use variance applicant to prove that the proposed use constitutes an inherently beneficial use . . . " *Id.* The amendments seek to make it clear that "an applicant must still prove that the use will *not substantially impair the zoning plan.* By restoring this balance, municipalities will again be able to evaluate a proposed use on a particular site to ensure that it does not have a negative impact on the overall zoning plan of the community." *Id.* (emphasis added).

47 *U.S.C.* s.332(c)(7), specifically preserves the control of the local zoning authorities by providing:

[N]othing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

[47 *U.S.C.* § 332(c)(7)(A).]

47 *U.S.C.* s.332(c)(7)(B)(iii) requires that:

[a]ny decision by a State or local government or instrumentality thereof to *deny* a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

[47 *U.S.C.* § 332(c)(7)(B)(iii) (emphasis added).]

■ Against this statutory background and the relevant case law, we consider Comcast's argument that the Board's stated reasons for denying the use variance application, as set forth in the memorializing resolution, were not grounded in fact and were conclusory in nature. We also consider Comcast's assertion that only the effect of a proposed facility at a specific location should be

considered as part of the negative criteria, and not the fact that there may be a zone elsewhere that permits similar facilities. Comcast points out that a contrary rule would create two different tests: one for towns that completely exclude the proposed inherently beneficial use, and one for those towns that exclude the use in some places, and allow it in others. Comcast also claims that no party has legitimately argued that the proposed site in the M–3 Zone is not suitable; arguments have only been made that there may be a "more" suitable site in the M–2 Zone.

We do not consider the record to support the proposition that the proposed erection of a 90' monopole is permitted in the M–2 Zone, as asserted by appellants. Nonetheless, after a review of the entire record, we cannot say the Board's findings are unsupported or that it acted arbitrarily, capriciously, or unreasonably in its balancing of the relevant considerations.

The Board, in applying *Sica*, first properly identified "the public interest at stake," accepting Comcast's assertion that the proposed antenna would assist in increasing the capacity and coverage of their present cellular communications system in the area. The Board concluded, however, that "the inherent beneficial characteristic of the proposed use is significantly less compelling than other types of inherently beneficial uses. . . ." The Board further noted that the proposed use "simply provides additional service to customers of Comcast." The Board's findings and conclusions with respect to this aspect of Comcast's application were not unreasonable.

We next look at the Board's second task relating to the identification of the detrimental effect that would ensue from the grant of the variance. The Board did not consider the consequences to be minimal, as it found that the monopole would be located on "a threshold street" and that the area is "in transition," thereby making it "vulnerable to inappropriate development." This finding is supported by expert testimony in the record. These findings support the Board's conclusion that the applicant failed to demonstrate that the variances could be granted without substan-

tial detriment to the public good. The Board concluded that the monopole would subject a main corridor to the Borough to aesthetic detriment, thereby bringing about the risk that the zone would not come out of its transition in accordance with the goals of the Zoning Plan. Even if we were to consider the detrimental effect as less than substantial, we cannot say that, based upon the Board's findings with respect to the weight to be given to the inherently beneficial use, that on balance approval was mandated.

Thirdly, the Board considered whether it might reduce the detrimental effect by imposing reasonable conditions on the use, but apparently was not able to find any means and further noted that Comcast "offered no conditions that would ameliorate the negative impact upon the public good and the intent and purpose of the Zoning Plan and Zoning Ordinance." The record is indeed barren of any suggestion as to how the 90' monopole at the threshold of the Borough from a major highway could be made less obvious or aesthetically pleasing.

■ Lastly, the Board balanced the positive and negative criteria to determine whether the variance could be granted without substantial detriment to the public good. In this regard, we look to the 1997 statutory amendments as well as the holding of our Supreme Court in *Sica, supra,* and conclude that the two are not incompatible. Rather, a proper application of the court's directive in *Sica* employs the same criteria the Legislature emblazoned in the statutory directive, namely, "[n]o variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance of other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." *N.J.S.A.* 40:55D–70d (*L.* 1997, *c.* 145). The prohibition had always remained that no relief may be granted even for an inherently beneficial use without a showing that the variance or relief can be granted without substantial detriment to the public good and that the grant would not substantially impair the intent

and purpose of the Zoning Plan and Zoning Ordinance. *N.J.S.A.* 40:55D–70.

There was substantial testimony in the record upon which the Board could conclude that there was detriment to the Zoning Plan as it pertained to future development of the M–3 Zone, an area in transition. There was uncontraverted evidence to support the Board's conclusion that the benefit to the general public was not significant. Considering the testimony that there were other technological means to accomplish the enhanced service sought by Comcast, including using existing towers, microcells, and the increasing use of digital technology, it cannot be said that the Board's conclusion is unreasonable or arbitrary. Moreover, the refusal of Comcast to disclose the identity of other locations was cited by the Board and no doubt was a significant factor in its conclusion that Comcast had not given sufficient consideration to other sites that would not as adversely impact upon the Borough's threshold area.

Comcast was required to carry the burden of proving that the negative criteria were met, as required by *N.J.S.A.* 40:55D–70d, namely, that the intent and purpose of the Zoning Plan and Zoning Ordinance will not be substantially impaired. *Weiner v. Zoning Bd. of Adj. of Glassboro,* 144 *N.J.Super.* 509, 516, 366 *A.2d* 696 (App.Div.1976). The Board did not have the burden "to find affirmatively that the plan would be substantially impaired." *Id.* We add that 47 *U.S.C.A.* § 332(c)(7)(B)(iii) does not impose upon the local authority the burden to demonstrate such impairment and thereby remove from the applicant the burden of proving that the variance will not substantially impair the intent and the purpose of the Zone Plan and Zoning Ordinance, as asserted by our dissenter. The Board's burden under the federal statute is satisfied when it denies a cellular tower use variance in writing and supports its decision with substantial evidence in a written record. Here, the Board satisfied its burden by setting forth in its May 2, 1995 written "resolution" nineteen detailed findings of fact and eleven statements of conclusions,

drawn from lengthy substantive hearings on the matter. The plain language of section 332 does not impose any additional burdens on the Board or relieve Comcast of its burden under the state statute.

Moreover, the dissenter's argument that the Board may have violated 47 *U.S.C.A.* § 332(c)(7)(B)(i)(I) and unreasonably discriminated among providers of functionally equivalent services ignores the true value of the prior grant and other available technological resources. The Board found that the existing towers, microcells, and the increasing use of digital technology were sufficient to meet Comcast's need for enhanced service along Route 287 and the accompanying area. As a result, the Board reasonably denied the erection of Comcast's proposed tower in close proximity to and with the same capabilities of the existing structure.

We are not unmindful of the labor and sensitivity reflected in the decision of the Law Division judge. We conclude, however, that where, as here, the issue is one that is close, the Board is in the better position to weigh the positive and negative criteria and make the determination as to whether on balance the grant of the variance can be made without substantial detriment. *Booth, supra,* 50 *N.J.* at 306, 234 *A.*2d 681. Considering the presumption in favor of the Board's decision, the Law Division should not have set it aside as arbitrary, capricious, or unreasonable. *Kramer, supra,* 45 *N.J.* at 296–97, 212 *A.*2d 153.

Reversed.

D'ANNUNZIO, J.A.D. (dissenting).

I would affirm the Law Division's reversal of the Board of Adjustment's (Board) denial of Comcast's variance application.

The Board's resolution did not address the affirmative criteria, apparently accepting the use as inherently beneficial, as we held in *Nynex Mobile Communications Co. v. Hazlet Tp. Zoning Bd. of Adj.,* 276 *N.J.Super.* 598, 609–12, 648 *A.*2d 724 (App.Div.1994). In *Pierce Estates v. Bridgewater Tp.,* 303 *N.J.Super.* 507, 697 *A.*2d

195 (App.Div.1997), relied on by intervenor-appellant, we affirmed the denial of a variance to build a steel "communications" tower 343 feet high in a residential zone. We concluded that the applicant had not established that the proposed tower was an inherently beneficial use. *Id.* at 517, 697 *A.2d* 195. *Pierce* is distinguishable from the present case because the proposed tower was to be built by the landowner who was not in the communications business. The tower would have been a speculative venture in the hope that once it was built a communications company might lease it. Consequently, we held that the applicant "was simply unable to show that any public need would actually be served by the proposed tower." *Ibid.*

The status of mobile communications facilities as inherently beneficial uses is enhanced by the Telecommunications Act of 1996 (TCA), Pub.L. No. 104–104, 110 Stat. 86, codified at 47 *U.S.C.A.* § 151 *et seq.* The TCA identifies the promotion of competition in the providing of commercial mobile services as a core value of the Act and as "in the public interest." 47 *U.S.C.A.* § 332(c)(1)(C). In *Sprint Spectrum L.P. v. Jefferson County,* 968 *F.Supp.* 1457 (N.D.Ala.1997), the court observed that the TCA "is designed to foster competition in the communications industry as the best means of promoting rapid deployment of advanced information technologies by the private sector, rather than the government." *Id.* at 1465; *accord Western PCS II Corp. v. Extraterritorial Zoning Auth.,* 957 *F.Supp.* 1230, 1237 (D.N.M.1997); *BellSouth Mobility Inc. v. Gwinnett County, Ga.,* 944 *F.Supp.* 923, 927 (N.D.Ga.1996).

The TCA specifically addresses local zoning authority. 47 *U.S.C.A.* § 332(c)(7)(A) provides that nothing in the TCA shall limit local authority regarding the placement of personal wireless service facilities, "[e]xcept as provided in this paragraph." The exceptions, described in 47 *U.S.C.A.* § 332(c)(7)(B) (hereafter subsection 7(B)), are significant. Subsection 7(B) provides:

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

 (I) shall not unreasonably discriminate among providers of functionally equivalent services; and

 (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the [Federal Communications] Commission for relief.

47 *U.S.C.* § 332(c)(7)(C) provides:

(C) Definitions

For purposes of this paragraph—

 (i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

 (ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

 (iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

In addition to establishing the "substantial evidence" standard to measure local action in section 332(c)(7)(B)(iii), subsection 7(B) manifests Congress' determination that the provision of wireless

communication service and its supporting facilities is an important national interest. As previously indicated, Congress also had determined that such services should be available from multiple providers in competition with each other. 47 *U.S.C.A.* § 332(c)(1)(C). At least one court has observed that the TCA's limitations on local zoning authority implements Congress' intent to increase competition in the industry. *Western PCS II, supra,* 957 *F.Supp.* at 1237. Thus, in terms of New Jersey zoning law, the Board's assumption that Comcast's proposed use is an inherently beneficial use was correct.

Because Comcast's monopole satisfied the affirmative criteria, the Board focused on the negative criteria, and denied the variance on that ground. In *Sica v. Board of Adj. of Wall,* 127 *N.J.* 152, 603 *A.*2d 30 (1992), the Court addressed the negative criteria in a case involving an inherently beneficial use. The Court held that in such a case the Board must balance the affirmative and negative criteria because "the need for balancing is implicit in the statutory requirement that the grant of a variance must be 'without substantial detriment to the public good.'" *Id.* at 164, 603 *A.*2d 30 (quoting *Medici v. BPR Co.,* 107 *N.J.* 1, 22 n. 12, 526 *A.*2d 109 (1987)). The Court observed that "not every detriment will support the denial of a use variance. Only one that is *'substantial'* will suffice." *Ibid.* (emphasis added).

The procedural guide suggested by the Court in *Sica* involves, in part, identification of "the detrimental effect that will enure from the grant of the variance." *Id.* at 166, 603 *A.*2d 30. Once the Board identifies the detrimental effect, it must "weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." *Ibid.* The Court noted that "[t]his balancing, '[w]hile properly making it more difficult for municipalities to exclude inherently beneficial uses ... permits such exclusion when the negative impact of the use is *significant.'*" *Ibid.* (emphasis added) (quoting *Baptist Home v. Borough of Riverton,* 201 *N.J.Super.* 226, 247, 492 *A.*2d 1100 (Law Div.1984)).

Applying this test, I am persuaded that the negative impact of the proposed monopole is not significant. The proposed location of the monopole in the Borough's most permissive industrial zone is the most important fact in this case. The M–3 zone is adjacent to Interstate Route 287 which, south of Route 22, is lined with industrial and commercial uses. The pole and its accessory facilities will occupy 2,500 square feet of a 133,000 square foot lot, the balance of which is used as a facility for the repair and storage of heavy machinery.

The majority opinion lists the permitted uses in the M–3 zone. Those uses include a variety of manufacturing and industrial processes, as well as office buildings and research facilities. On its face, Comcast's pole with its array of antennas is compatible with those uses. The objectors' planning expert testified that desirable manufacturing and office uses would not seek to locate in the M–3 zone if the pole is installed. However, he presented no empirical evidence to support that rather startling statement. Equally feeble as a rationale for precluding the pole was his testimony that the pole would not create jobs and would not contribute to the tax base. Although the pole and its supporting equipment will not create a single job, the installation is utilizing only 2,500 square feet of a large industrial lot and is not displacing any existing employment opportunities. I conclude that the record does not support a finding as required in *Sica, supra,* that the proposed monopole's negative impact, if any, would be significant or substantial.

I agree with the majority that the record does not adequately support the conclusion that the monopole is a permitted use in the nearby M–2 zone. That zone permits "Television and Radio Studios and Antennas." The language suggests that a permitted antenna must be used in connection with a television or radio "studio." Comcast's application does not involve construction of a "studio." Moreover, the proposed pole would exceed the M–2 zone's height limitations and a variance under *N.J.S.A.* 40:55D–70d(6) would be required. In any event, the Board's resolution

did not find that the pole is a permitted use in the M–2 zone and the Board's denial was not based on such a fact.

Comcast's application preceded enactment of the TCA[1] and neither the Board nor the Law Division applied the federal statute. Nevertheless, the Law Division's judgment is consistent with the TCA, and the TCA buttresses the conclusion that the Board erred in denying Comcast's application. The requirement in 47 *U.S.C.A.* § 332(c)(7)(B)(iii) that a local government's denial of an application to locate a wireless service facility be "supported by substantial evidence" imposes the burden of persuasion on the local government agency. *See Sprint Spectrum L.P., supra* (holding that zoning authority's moratorium on processing of development permits for cellular communication towers violated the TCA); *Illinois RSA No. 3, Inc. v. County of Peoria,* 963 *F.Supp.* 732 (C.D.Ill.1997) (holding that denial of special use permit to build cellular communications tower in low density residential district violated TCA because it was not supported by substantial evidence, though the denial was not arbitrary or capricious and, therefore, did not violate the Illinois Constitution); *Western PCS II, supra* (holding that denial of special exception request to mount wireless telecommunications antenna to water tank violated TCA because it was not supported by substantial evidence; it amounted to unreasonable discrimination among providers of functionally equivalent services, and violated TCA's requirement that local regulations not have the effect of prohibiting provision of personal wireless services); *BellSouth Mobility Inc., supra* (holding that denial of tall structure permit for a monopole of 197 feet violated TCA because it was not supported by substantial evidence). The TCA shifts the burden of persuasion to the Board whether or not the facility is considered an inherently beneficial use under New Jersey zoning law. Thus, it appears that the TCA dilutes the impact of the 1997 amendment of *N.J.S.A.* 40:55D–70c

---

[1] The TCA was enacted on February 8, 1996.

and d, as applied to wireless communications facilities. *L.* 1997, *c.* 145.

Although the issue was not raised below, the Board also may have violated 47 *U.S.C.A.* § 332(c)(7)(B)(i)(I) which provides that a local government "shall not unreasonably discriminate among providers of functionally equivalent services." This subsection of the TCA is relevant because the Board, by resolution dated August 2, 1994, nine months before it denied Comcast's application, granted a variance to one of Comcast's competitors to permit the erection of a steel tower 191 feet in height in the M–3 zone. The United States District Court addressed similar facts in *Illinois RSA No. 3, supra,* and found that the County had violated the TCA's antidiscrimination provision. The court stated:

> The County admits that it has permitted a cellular tower in the R2 district, and the Zoning Code also does not expressly permit cellular towers as special uses in the R2 district just as it does not do so for the R1 district. If the County refuses to permit towers in the R1 district but allowed one in the R2 district, then it violated the Telecom Act's antidiscrimination provision. 47 *U.S.C.* § 332(c)(7)(B) prohibits local governments from unreasonably discriminating "among providers of functionally equivalent services." The County offers no reason why it would permit someone to construct a cellular tower in the R2 district and not the R1 district. And without any reason, discrimination is unreasonable and violates the Telecom Act.

> [963 *F.Supp.* at 744.]

The Board's resolution in the present case did not attempt to distinguish Comcast's application from the 1994 application. In addition to being relevant regarding the discrimination issue, the prior approval, involving a higher and larger tower in the same zone, provides additional support for the conclusion that the denial of Comcast's application was not supported by substantial evidence.

I make a concluding observation. Until the ripening of new technology makes these antennas unnecessary, they will be built. If so, then it appears that in most cases their construction in commercial/industrial zones, such as South Plainfield's M–3 zone, rather than in residential areas, will have the least impact on a community. Moreover, if a municipality may preclude a wireless

communication facility in an industrial/commercial zone such as the M–3, as the majority holds, then it can prevent the location of such facilities in more restrictive zones. It is unlikely that the federal courts, in applying the TCA, will permit such limitations on the development of a competitive wireless communications network.[2]

I would affirm the Law Division.

---

[2] It is likely that future challenges of local zoning decisions preventing the construction of such facilities will be in the United States District Court. *See* 47 *U.S.C.A.* § 332(c)(7)(B)(v); 28 *U.S.C.A.* § 1331.